OPINION *Page 2 
{¶ 1} Plaintiffs-appellants Joel, Maureen and Nicholas Aratari appeal the decision of the Columbiana County Common Pleas Court grating summary judgment in favor of defendants-appellees Leetonia Exempted Village School District, Leetonia School Superintendent Thomas Inchak and (former) Leetonia High School Principal John Rydarowicz (collectively referred to as the school district). The issue raised in this appeal is whether the immunities enumerated in R.C. Chapter 2744 are applicable to Leetonia School District. For the reasons expressed below, the decision of the trial court is affirmed.
 STATEMENT OF THE CASE {¶ 2} On December 10, 2002, after gym class, Nicholas was assaulted by another student by the name of Tommy Hart. Hart's assault on Nicholas was undisputedly unprovoked. The assault led to charges and a criminal conviction for Hart. Nicholas was severely injured and is still recovering.
 {¶ 3} Furthermore, as a result of the unprovoked attack, the Arataris brought suit against the school claiming that the attack was foreseeable given Hart's history. Specifically, they alleged that the school district knew Hart had a disciplinary history that involved assaulting students, yet the school district did not take the necessary precautions to protect other students from Hart.
 {¶ 4} Hart did have a disciplinary history with Leetonia School District. In April 2002, Hart was suspended for engaging in a fight with another student. Further investigation into the matter disclosed that Hart may not have been the instigator of the fight, thus, Hart's suspension was overturned. However, Principal Rydarowicz, Superintendent Inchak, counselors for Hart and Hart's mother all agreed that Hart would complete the remainder of the school year at home through home instruction. At this meeting, it was also discussed whether Hart had an emotional disability. Thus, as a result, the school district began the process of determining whether Hart was disabled in accordance with the Federal Individuals With Disabilities Education Act (IDEA) law.
 {¶ 5} When the next school year began, the IDEA evaluation process was supposed to begin. However, the process was interrupted by Hart's transfer to Oak *Page 3 
Glenn High School is West Virginia. After a short period, Hart returned to Leetonia Schools.
 {¶ 6} Hart also had some disciplinary problems in the beginning of the 2002-2003 school year. In September 2002, he received three days suspension for improper language. In November 2002, he received detention for throwing a paper airplane.
 {¶ 7} Also in November 2002, an incident occurred between Hart and a student named Chris Meade. During gym class, Meade had "screwed up" at whiffle ball and caused his team to lose. Hart, after class, put Meade in a "sleeper hold," which supposedly caused many students to laugh at Meade. Allegedly, Meade passed out from the sleeper hold.
 {¶ 8} After this transpired, a rumor started that Meade was going to bring a gun to school. A teacher heard the rumor and informed the superintendent and principal. Leetonia Police were then brought in to investigate. The police looked into the matter and informed the principal and superintendent about the "sleeper hold" incident. The principal and superintendent asked Meade if there were any problems between himself and Hart. Meade indicated there was not. Other students were asked about the matter and given their responses, the principal and superintendent concluded that the students had engaged in "horseplay" and there was no serious problem between Meade and Hart.
 {¶ 9} In response to the lawsuit, the school district asserted immunities under R.C. Chapter 2744. After discovery, the school district filed a motion for summary judgment. The Arataris opposed the motion.
 {¶ 10} On January 17, 2006, the trial court granted summary judgment for the school district. While the trial court does not go into depth regarding its decision, it does state:
 {¶ 11} "The Leetonia Exempted Leetonia School District is a political subdivision. It is potentially immune in such circumstances regardless of the unfortunate nature, as here, of an individual student's conduct. Nicholas Aratari was undoubtedly seriously injured. However, the Court agrees with the Defendants' analysis of the law of immunity and further case law concerning the reasonable discretion of school personnel with respect to such matters. * * * *Page 4 
 {¶ 12} "The Court has engaged in a three-tiered analysis of the statute; finds the School District to be a political subdivision; finds it to be immune under these circumstances; and does not find that either acts or omissions by the employees of the School District were with malicious purpose, in bad-faith, or in a wanton or reckless manner, which would dispense with the cloak of immunity. In fact, the Court finds that the supervision of Tommy Hart by the teacher in charge at the time of the incident was not even negligent."
 {¶ 13} The Arataris appeal from that decision raising one assignment of error
 ASSIGNMENT OF ERROR {¶ 14} "THE LOWER COURT ERRED WHEN IT GRANTED THE APPELLEES SUMMARY JUDGMENT BASED UPON IMMUNITY ON ALL CLAIMS ALLEGED BY THE ARATARIS."
 {¶ 15} "The determination as to whether a political subdivision is immune from suit is purely a question of law properly determined by a court prior to trial and preferably on a motion for summary judgment."Schaffer v. Board of Cty. Commrs. of Carroll Cty., Ohio (Dec. 7, 1998), 7th Dist. No. 672, citing Conely v. Shearer, 64 Ohio St.3d 284, 292,1992-Ohio-133. An appellate court reviews a trial court's decision on a motion for summary judgment de novo. Bonacorsi v. Wheeling Lake ErieRy. Co., 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24. Summary judgment is properly granted when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64, 66; Civ.R. 56(C).
 {¶ 16} "The Political Subdivision Tort Liability Act, as codified in R.C. Chapter 2744, requires a three-tiered analysis to determine whether a political subdivision should be allocated immunity from civil liability." Hubbard v. Canton Bd. of Edn., 97 Ohio St.3d 451,2002-Ohio-6718, ¶ 10, citing Cater v. Cleveland, 83 Ohio St.3d 24, 28,1998-Ohio-421. "Under the first tier, R.C. 2744.02(A) grants broad immunity to political subdivisions. If immunity is established under R.C. 2744.02(A), such immunity is not absolute, however. Under the second tier of the analysis, one of five exceptions set forth in R.C.2744.02(B) may serve to lift the blanket of general immunity. Our analysis does not stop here, because under the third tier of the analysis, immunity may *Page 5 
be `revived' if the political subdivision can demonstrate the applicability of one of the defenses found in R.C. 2744.03(A)(1) through (5). Ziegler v. Mahoning Cty. Sheriff's Dept. (2000),137 Ohio App.3d 831." Summers v. Slivinsky, 141 Ohio App.3d 82, 86-87,2001-Ohio-3169 (overruled on other grounds, Allied Erecting Dismantling Co., Inc. v. Youngstown, 151 Ohio App.3d 16,2002-Ohio-5179).
 {¶ 17} Thus, our analysis begins at the first tier. Under the first tier, we must determine if the school district is considered a political subdivision. R.C. 2744.02 (A)(1). The Ohio Supreme Court has held that it is and, as such, the general grant of immunity applies.Hubbard, 2002-Ohio-6718. In Hubbard, the Court explained that a school board meets the first tier and qualifies for general immunity because subsection (F) of R.C. 2744.01 declares public school districts to be political subdivisions and R.C. 2744.01(C)(2)(c) states that the provision of a system of public education is a governmental function.Hubbard, 2002-Ohio-6718, at ¶ 11. Therefore, we conclude on that basis that the first tier is met.
 {¶ 18} We now turn our analysis to the second tier. Under the second tier, it must be determined if one of the exceptions listed in R.C.2744.02(B)(1)-(5) pierces the veil of immunity. In determining this, we must look to the version of R.C. 2744.02(B) that was in effect at the time of the assault.[1] It states:
 {¶ 19} "(B) Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:
 {¶ 20} "(1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to persons or property caused by the negligent operation of any motor vehicle by their employees upon public roads, highways, or streets when the employees are engaged within the scope of their employment and authority. The following are full defenses to that liability:
 {¶ 21} "(a) A member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct; *Page 6 
 {¶ 22} "(b) A member of a municipal corporation fire department or any other firefighting agency was operating a motor vehicle while engaged in duty at a fire, proceeding toward a place where a fire is in progress or is believed to be in progress, or answering any other emergency alarm and the operation of the vehicle did not constitute willful or wanton misconduct;
 {¶ 23} "(c) A member of an emergency medical service owned or operated by a political subdivision was operating a motor vehicle while responding to or completing a call for emergency medical care or treatment, the member was holding a valid commercial driver's license issued pursuant to Chapter 4506. or a driver's license issued pursuant to Chapter 4507. of the Revised Code, the operation of the vehicle did not constitute willful or wanton misconduct, and the operation complies with the precautions of section 4511.03 of the Revised Code.
 {¶ 24} "(2) Except as otherwise provided in sections 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.
 {¶ 25} "(3) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their failure to keep public roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, or public grounds within the political subdivision open, in repair, and free from nuisance, except that it is a full defense to such liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge.
 {¶ 26} "(4) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to persons or property that is caused by the negligence of their employees and that occurs within or on the grounds of buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code.
 {¶ 27} "(5) In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to persons or *Page 7 
property when liability is expressly imposed upon the political subdivision by a section of the Revised Code, including, but not limited to, sections 2743.02 and 5591.37 of the Revised Code. Liability shall not be construed to exist under another section of the Revised Code merely because a responsibility is imposed upon a political subdivision or because of a general authorization that a political subdivision may sue and be sued." R.C. 2744.02 (version in effect in December 2002).
 {¶ 28} A reading of these sections indicates that the only possible applicable section is four. R.C. 2744.02(B)(4), as quoted above, grants an exemption from immunity for injuries resulting from the negligence of political subdivision employees occurring "within or on the grounds of buildings that are used in connection with the performance of a governmental function."
 {¶ 29} The Ohio Supreme Court, in Hubbard, analyzed this specific subsection and stated that "the exception to political-subdivision immunity in R.C. 2744.02(B)(4) applies to all cases where an injury resulting from the negligence of an employee of a political subdivision occurs within or on the grounds of buildings that are used in connection with the performance of a governmental function. The exception is not confined to injury resulting from physical defects or negligent use of grounds or buildings. Since the injuries claimed by plaintiffs were caused by negligence occurring on the grounds of a building used in connection with a government function, R.C. 2744.02(B)(4) applies and the board is not immune from liability."
 {¶ 30} It is acknowledged that the statute was changed in 2003 to limit liability for negligence that is "due to physical defects within or on the grounds" that are used in connection with the performance of a governmental function. This does not, however, change the Ohio Supreme Court's analysis in Hubbard. The Hubbard court was faced with the argument that the legislature had attempted to change the statute to its current version, and thus, that showed what the legislature intended in its old version. The Supreme Court rejected this argument stating:
 {¶ 31} "We acknowledge that the General Assembly has attempted to change the language of R.C. 2744.02(B)(4). We are bound to apply the words of the law in effect at the time the alleged negligent acts occurred. The board urges us to add words to R.C. 2744.2(B)(4). We decline to rewrite the subsection to produce a different result than the words of the statute require." Id. at ¶ 17. *Page 8 
 {¶ 32} Considering Hubbard and the version of the statute that was in effect at the time of Nicholas' injury, a negligent act of an employee that occurs on the school grounds and causes injury to a student falls within R.C. 2744.02(B)(4). Therefore, since the attack that injured Nicholas occurred on school property, we now must determine whether the school district acted negligently.
 {¶ 33} The alleged negligence claimed by the Arataris is a breach of the duty of supervision. They claim that given Hart's history, the school district knew it was foreseeable that Hart would cause serious injury to another student.
 {¶ 34} We begin our analysis of the school district's possible negligence by noting that the primary duty of a teacher is education, not protection. Boyer v. Jablonski (1980), 70 Ohio App.2d 141, 146. That is not to say that teachers in all cases are immune from suit when students are injured because of a failure by the teacher to protect the student. Id. But, immunity will apply when an unforeseeable assault occurs in the classroom by one student upon another student. Id.
 {¶ 35} The Arataris argue that Hart's attack was foreseeable given Hart's disciplinary record in the Leetonia School System. The evidence clearly reveals that Hart had discipline problems in the Leetonia School System. Deposition testimony revealed that the school district was aware of the minor infractions of language, disruption in class, and tardiness. (Rydarowicz Depo. 65-67). It is also clear that the school district knew that the "sleeper hold" incident had occurred. That said, the district, after investigation of that incident, concluded that it amounted to horseplay. Nothing in the depositions, including testimony given by Nicholas, refutes such determination. Detective John Finch of the Leetonia Police Department even stated the incident involving the sleeper hold could have been characterized as horseplay. (Finch Depo. 99).
 {¶ 36} The other major infraction the Arataris rely on to show the unprovoked attack was foreseeable was the fight that occurred at the end of the 2001-2002 school year between Hart and another student. As aforementioned, this incident resulted in Hart's suspension. However, that suspension was reversed because of further investigation into the matter revealing that Hart was not the instigator. Thus, from that incident, the only insight the school district would have about Hart is that if he was provoked he would fight. The occurrence between Hart and Nicholas was undisputedly unprovoked. *Page 9 
 {¶ 37} The other incident the Arataris discuss is a 2000 domestic violence incident between Hart and his younger sister, Krystal. (Young Depo. 6-15). That incident occurred at the school bus stop. The police report indicates that Hart called his sister a number of names. (Young Depo. 10-11). Krystal responded by telling Hart to get out of her face. (Young Depo. 11). Hart then punched Krystal in the face twice, grabbed her by the wrists and threw her books on the ground. (Young Depo. 11). The incident left minor red marks on her face. (Young Depo. 12-13). Charges were filed against Hart. Detective Young went to Leetonia High School to take Hart into custody. (Young Depo. 15). Detective Young advised the principal that he had a criminal investigation going on involving Hart and that he wished to see him. (Young Depo. 15). Detective Young stated that he did not discuss the details of the case with the principal and that when Hart was brought to the office, he took Hart into custody and transported him to the juvenile detention center. (Young Depo. 16). Thus, from that information, it could be concluded that the school district knew Hart was in some trouble, however, none of the details were discussed with the school district. Nothing in the record suggests that the school bus driver told the school district of the incident.
 {¶ 38} The Arataris also mention Hart's alleged reputation for being a bully. However, nothing in the record indicates that any student informed the school district that Hart was a bully. In fact, the gym teacher testified that he was never told that Hart was bullying students. (Donatelli Depo. 25). Furthermore, Detective John Finch testified that it was only after Hart attacked Nicholas that he became of the opinion that Hart had a violent attitude. (Finch Depo. 99). Principal Rydarowicz testified that he did not view Hart as a disciplinary problem at the start of the school year in 2002. (Rydarowicz Depo. 60). He explained from the start of the school year in September 2002 until December 9, 2002, Hart had four disciplinary offenses: language and conduct in class, inappropriate conduct by drinking pop in class, tardiness for the fifth time, and lastly, throwing a paper airplane in class. (Rydarowicz Depo. 65-66).
 {¶ 39} That said, Joel Aratari testified that he had a conversation with Rydarowicz and Rydarowicz stated that Hart was a problem. (Joel Aratari Depo. 23). Also, there is some dispute as to whether or not a local police officer, John Finch, told Principal Rydarowicz that something needed to be done about Hart. Joel Aratari testified that after Nicholas was assaulted by Hart, Finch came to his house and told them that he had a conversation with Rydarowicz and Inchak (superintendent) that he *Page 10 
was tired of coming to school about Hart and that something should be done about him. (Joel Aratari Depo. 55-60). However, Joel was not sure whether Officer Finch had the conversation with Rydarowicz and Inchak before or after the assault on Nicholas occurred. (Joel Aratari Depo. 57). Officer Finch does not remember the conversation with either Joel Aratari or the superintendent, but he says that it could have happened. (Finch Depo. 106, 108-112).
 {¶ 40} Given all the above, it must be determined whether or not evidence establishes a genuine issue of material fact as to whether the unprovoked attack was foreseeable. In Williams v. Columbus Bd. ofEdn. (1992), 82 Ohio App.3d 18, the Tenth Appellate District affirmed the trial court's grant of summary judgment for a school district in a case where three male students raped a female student. The court stated that the rape was not foreseeable. It explained:
 {¶ 41} "The attack and rapes being unforeseeable, defendant did not owe to plaintiff Jennifer Williams the duty of either protecting her from the three male students or of escorting the three out of the building. In opposing defendant's motion for summary judgment, plaintiffs attached the disciplinary records of the three male students as well as the history of disciplinary problems at the middle school. Such records indicate that, despite the three male students' unruly behavior, they had no history of committing criminal assault to the degree or of the nature involved in the rapes of plaintiff Jennifer Williams. During the academic year immediately preceding the rapes, the male students, however, had been reprimanded a total of approximately twelve times for fighting and for general unruliness." Id.
 {¶ 42} It went on to explain that only one prior circumstance concerning one boy was arguably remotely similar. In that circumstance, one of the boys straddled the desk of a female student and engaged in conduct offensive to her. The court explained that while that conduct may well have been extremely offensive, it was not so heinous that the teachers should have reasonably anticipated that the student would commit criminal assault or rape if not supervised. Id.
 {¶ 43} That same rationale applies in the matter at hand. The incidents that the school district was aware of do not show that it was foreseeable that Hart would, unprovoked, criminally assault Nicholas. The "sleeper hold" incident, after investigation, was concluded to be horseplay. Thus, it does not provide foreseeability for Hart's assault on Nicholas. Likewise, the fight between Hart and another student *Page 11 
that occurred at the end of the 2001-2002 school year was a provoked fight. Thus, it only provides foreseeability as to a provoked fight. Hart's other disciplinary infractions were minor: language in class, paper airplanes and tardiness. These infractions do not provide insight that Hart would attack another student when unprovoked. The Arataris claim that law enforcement officials viewed Hart as a problem and that something needed to be done about him was not clearly supported by the record. Nor was their claim that the school district viewed Hart in the same manner. The deposition testimony was inconclusive as to whether such conversations occur before or after the unprovoked attack. Furthermore, regarding the incident that occurred between Hart and his sister, it is unclear from the record whether the school district was aware of what exactly occurred. As stated above, the officer testified that he did not inform the school district of the specifics of the incident. These facts do not show foreseeability.
 {¶ 44} Likewise, it must also be noted that the attack occurred at the end of gym class approximately two to three minutes after the boys entered the locker room to change. (Donatelli Depo. 21). The teacher was picking up the equipment used in class that day when students told him to "get in there." (Donatelli Depo. 22). It cannot be concluded that leaving students for a couple of minutes to get dressed after gym class is a failure to supervise. While teachers have a duty to supervise, that duty does not include the duty to follow a student around continuously. Such a requirement is unrealistic and we cannot find that there is such a duty. Furthermore, given the facts known to the school district at the time of the attack, it does not appear such supervision would have been warranted, even if it was realistic.
 {¶ 45} Furthermore, there is also the issue of the school district's obligation to investigate the matter concerning whether Hart had an emotional disability, i.e. whether Hart was disabled and whether he could have been removed from his current educational placement. The Individuals With Disabilities Education Act (IDEA), 20 U.S.C. 1401, et seq., covers this issue. Hart was being evaluated under this statute. It states during the evaluation process the child is to remain in the then current educational placement until the proceedings are completed (known as the "stay put" provision). 20 U.S.C. 1415(j).
 {¶ 46} The IDEA evaluation began in September 2002. At the time the incident between Hart and Nicholas occurred in December 2002, the IDEA evaluation was not *Page 12 
completed. There is some discussion by the Arataris that the evaluation process, which was originally discussed in April/May 2002 was taking a long time. However, Hart was home schooled at the end of the 2001/2002 school year, therefore, the evaluation process could not have occurred then. Furthermore, for a short period of time, at the beginning of the 2002-2003 school year, Hart was not in Leetonia School District. Therefore, that caused a delay in the evaluation. That said, it did take some time for the evaluation process to occur. As of December 2002, when Hart assaulted Nicholas, the evaluation process had not yet been completed.
 {¶ 47} Regardless, the evaluation process and the stay put provision in the United States Code, indicates that the school district did not have too much of an option in removing Hart from the high school. As such, the school district could not have removed Hart from his current educational placement by isolating him from other students.
 {¶ 48} Thus, considering all the above, we find that R.C.2744.02(B)(4) was not met. Given the evidence there is no genuine issue of material fact as to whether the school district breached its duty. Thus, the school district's veil of immunity was not pierced.
 {¶ 49} At this point, we note that the third tier defenses, enumerated under R.C. 2744.03, are relevant only in determining the immunity of a political subdivision where a plaintiff has shown that a specific exception to immunity under R.C. 2744.02(B) applies. Ziegler,237 Ohio App.3d 831. Since we found that R.C. 2744.02(B) was not met, our analysis could stop here. However, we continue for the dual purpose of addressing an issue likely to come before this court in the future, and as an alternative ground to affirm the decision of the trial court.
 {¶ 50} The Arataris argue that none of the defenses in R.C. 2744.03
are applicable. Their arguments focus solely on subsection (A)(3) and (5). It reads as follows:
 {¶ 51} "(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
 {¶ 52} "* * * *Page 13 
 {¶ 53} "(3) The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.
 {¶ 54} "* * *
 {¶ 55} "(5) The political subdivision is immune from liability if the injury, death, or loss to persons or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C.2744.03(A)(3) and (5).
 {¶ 56} However, it must be remembered that "[t]hese defenses do not indicate that the legislature intended to relieve political subdivisions from liability for all negligent actions of their employees. Hallett v.Stow Bd. of Edn. (1993), 89 Ohio App.3d 309, 313. The defenses to liability in R.C. 2744.03 must be read narrowly. Howell v. Union Twp.Trustees (Mar. 18, 1997), 4th Dist. No. 96CA2430. 'In other words, the defenses and immunities of R.C. 2744.03 cannot be read to swallow up the liability provisions of R.C. 2744.02(B) so as to render them nugatory.' Id." Willis v. Commodity Specialists Co., 158 Ohio App.3d 444,2004-Ohio-4807, ¶ 17.
 {¶ 57} It has been held that the "[discretion, as it is referred to in R.C. 2744.03(A)(3) and (5), involves policy-making and the exercise of independent judgment. Hacker v. Cincinnati (1998), 130 Ohio App.3d 764, 770." Willis, 2004-Ohio-4807, ¶ 17. Courts have explained the discretion which allows for immunity and that which does not as follows:
 {¶ 58} "To summarize the standard for legal liability with a rather simplistic example, if defendant board of education decided to operate a school bus transportation system and to purchase certain buses, it would be immune from liability for an injury resulting from the design of a certain type of bus as it weighed alternative choices about what type of bus to purchase unless its judgment in purchasing the bus was exercised with malicious purpose and bad faith, or in a wanton or reckless manner (none of that type of conduct is alleged in this case). On the other hand, if the accident were caused by the manner in which the school bus driver operated the bus *Page 14 
or carried out the details of the bus transportation, the board of education would be liable for the negligence of its employees as would any other employer." Bolding v. Dublin Local School Dist. (June 15, 1995), 10th Dist. No. 94APE09-1307.
 {¶ 59} Likewise, the Ninth Appellate District has stated that the negligent supervision of children on a playground does not involve the type of decision making with respect to public policy and planning that is characterized by a high degree of discretion and judgment. DuBose v.Akron Public Schools (Apr. 29, 1998), 9th Dist. No. 18707.
 {¶ 60} The Arataris argue that the school district had a duty to supervise. It is their position that the discretion involved in supervising Hart in Leetonia High School after his discipline problems is not the type of discretion in (A)(3) and (5) for which the legislature grants immunity.
 {¶ 61} The supervision they are implying should have been given is an intensive supervision. That type of supervision as stated above is unrealistic. It would require a teacher to follow the student around the entire day. In all actuality, it is one-step below expulsion. Expulsion or an intensive supervision program is a decision that is within the enforcement powers of either the superintendent and/or principal. Furthermore, it is a true discretionary decision that requires independent judgment based upon the facts known about the child and about the appropriate personnel working in the school who could perform such duty. That type of supervision cannot be likened to watching children on a playground. It requires more discretion than that and would ultimately require the principal, superintendent or a person with more authority than a teacher to decide whether the child should or should not be supervised to that degree. We find that this type of decision falls squarely within (A)(3) and (A)(5), and thus, would render the school district not liable.
 {¶ 62} The Arataris then argue that even if R.C. 2744.03(A)(3) and (5) are applicable, the school district is still liable under R.C.2744.03(A)(6) because the school district acted recklessly. This section states:
 {¶ 63} "(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or section 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies: *Page 15 
 {¶ 64} "(a) His acts or omissions were manifestly outside the scope of his employment or official responsibilities;
 {¶ 65} "(b) His acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
 {¶ 66} "(c) Liability is expressly imposed upon the employee by a section of the Revised Code."
 {¶ 67} Generally, the issue of malice, bad faith, and wanton or reckless behavior is a question for the jury. Shadoan v. Summit Cty.Children Serv. Bd., 9th Dist. No. 21486, 2003-Ohio-5775, at ¶ 14, citingFabrey v. McDonald Police Dept., 70 Ohio St.3d 351, 356, 1994-Ohio-368. However, the standard for demonstrating such conduct is high.Shadoan, 2003-Ohio-5775, at ¶ 14.
 {¶ 68} One acts wantonly when there is a complete failure to exercise any care whatsoever. Fabrey, 70 Ohio St.3d at 356. Importantly, "mere negligence will not be construed as wanton misconduct in the absence of evidence establishing a disposition of perversity on the part of the tortfeasor[.]" Shadoan, 2003-Ohio-5775, at ¶ 13, citing Fabrey,70 Ohio St.3d at 356.
 {¶ 69} One acts recklessly if:
 {¶ 70} "[H]e does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." Shadoan, 2003-Ohio-5775, at ¶ 13.
 {¶ 71} The Arataris claim that the school district knew all of Hart's problems. They list a plethora of incidents that they state the school district knew. However, they overstate their case.
 {¶ 72} An example of the overstatement is their statement that the school district knew Hart assaulted his sister. The record in this case does not clearly reveal that the school district knew this. It is clear that the incident occurred at the bus stop and it is clear that an officer went to the school regarding the incident, but it is also clear that the officer did not tell the school the details of why he was there. Furthermore, the officer stated he did not interview the bus driver or any other witness. *Page 16 
Therefore, it is unclear if the bus driver or anyone else could have informed the school district of the domestic violence incident between Hart and his sister.
 {¶ 73} Another example is the claim that the school district knew that Hart was terrorizing other students. The record contains no such indication. The record does show that Hart had fights and was disruptive at points, but it does not show a terrorizing nature.
 {¶ 74} Another example of overstatement is the claim that Hart was "constantly in and out of prison." Hart was in the juvenile detention center at times and the school district was aware of this, but a juvenile detention center is not a prison. The implications of being "in and out of prison" are not the same as being in a juvenile detention center.
 {¶ 75} One last example is the Arataris claim that teachers were scared of Hart. The record fails to show this. In fact, Donatelli, the one teacher who was deposed, never stated or remotely suggested that he was frightened of Hart.
 {¶ 76} As aforementioned, we have noted what the school district knew. It knew of the "sleeper hold" incident, it knew of a fight from the previous year that was classified as an instigated fight, and it knew of a minor infraction at the beginning of the school year in 2002. Given what it knew, even if we had concluded that there was a genuine issue of material fact as to whether the school district was negligent, we certainly cannot claim their actions amounted to recklessness. Nothing in the record suggests that the actions of either Rydarowicz or Inchak or even Donatelli's supervision of Hart reached the level of recklessness. Thus, the Arataris argument concerning R.C. 2744.03(A)(6) also fails.
 {¶ 77} In conclusion, we find that under the second tier of governmental immunity, R.C. 2744.02(B), the veil of immunity was not pierced. However, even if it could have been concluded that it was pierced, the school district is still immune under R.C. 2744.03(A)(3) and (5). Furthermore, we cannot find that the school district acted recklessly.
 {¶ 78} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
DeGenaro, P.J., and Donofrio, J., concurs.
[1] The version of the immunity statute that is applicable is the law that was in effect at the time the alleged negligent acts occurred.Hubbard, 2002-Ohio-6718, at ¶ 17. *Page 1