[Cite as *Luke v. Short Creek Joint Fire Dist.*, 2025-Ohio-203.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
JEFFERSON COUNTY

AMANDA LUKE, ADMINISTRATOR OF ESTATE OF
MARGUERITE APPEL, DECEASED,

Plaintiff-Appellee,

v.

SHORT CREEK JOINT FIRE DISTRICT et al.,

Defendants-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 JE 0005**

---

Civil Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 21 CV 238

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Reversed.

---

*Atty. Charles M. Rittgers*, *Atty. Neal D. Schuett,* Rittgers Rittgers & Nakajima, *Atty. Jeffrey J. Bruzzese, Atty. Craig A. Schlapprizzi,* Donald Schlapprizzi, P.C, for Plaintiff-Appellee and

*Atty. James H. Gordon*, *Atty. Jeremy R. Kopp,* Lock Gordon Law Group, LLC, for Defendants-Appellants.

Dated:  January 23, 2025

**Robb, P.J.**

{¶1} Defendants-Appellants Short Creek Joint Fire District and two employees appeal the decision of the Jefferson County Common Pleas Court denying their motion for summary judgment. They claimed immunity in the lawsuit filed by Appellee Amanda Luke, individually and as administrator of the Estate of Marguerite Appel (the decedent).

{¶2} The political subdivision argues there was no evidence of negligence as required for the immunity exceptions involving the operation of a motor vehicle or the performance of a proprietary function, arguing there was no breach of a duty that proximately caused the decedent's injury. In arguing the lack of duty for negligence, the political subdivision emphasizes the primary assumption of the risk doctrine and argues there was no showing of recklessness as required to defeat the doctrine. We agree and find the political subdivision was entitled to summary judgment.

{¶3} The employees contend they are immune because their performance was not reckless as required to invoke the recklessness exception to employee immunity. It is also argued their performance was not manifestly outside the scope of employment, while pointing out this exception was not invoked by Appellee below. We agree and find the employees were entitled to summary judgment.

{¶4} For the following reasons, the trial court's decision is reversed, and summary judgment is granted to the political subdivision and the employees based on immunity.

STATEMENT OF THE CASE

{¶5} On September 9, 2019, Marguerite Appel fell out of a moving fire truck and died during a ceremonial "honor ride" conducted after the funeral for her step-brother, James Horton, who was "laid in state" as the former fire chief of Short Creek Joint Fire District (and a long-time member of Adena Volunteer Fire Company before it merged into the joint fire district). Chief Horton had "medically retired" shortly before his death after an illness kept him from his job. The community meeting hall portion of the fire station was the location for two days of viewing (calling hours) and a third day for the funeral. The fire truck garage was set up for a lunch after the funeral. Firefighters came from

surrounding departments in dress uniforms to participate in the funeral after which the casket was loaded into a vehicle by uniformed participants while others stood in formation, followed orders, and saluted. The vehicle containing the casket proceeded down the street in a procession with other SCJFD vehicles that had their flashing lights activated.

{¶6} When fire engine 2218 returned to the station with firefighter Chad Durbin driving, ten family members boarded it for the honor ride before the post-funeral lunch. Most of them were wearing matching fire department t-shirts provided by SCJFD. One family member sat in the front passenger seat. The other nine (seven adults and two children) entered the back compartment from the rear driver's side door. There were four seats with seat belts in the back compartment, two rear-facing and two forward-facing. The back compartment positions were as follows: four adults sat in the four seats; the two children sat on the laps of the adults in the seats on the passenger side; an adult sat on a box installed between the rear-facing seats; one adult sat on the lap of another adult in the rear-facing driver's side seat; and Ms. Appel occupied a recessed space across from the latter seat.

{¶7} When Ms. Appel entered the compartment, she stood in a step-down area close to the rear driver's side door instead of taking an available seat, which was then offered to additional family members observing the loading. Just over a quarter of a mile from the fire department, as the fire truck proceeded along a right hand curve in the road, the back door opened and Ms. Appel fell backwards from the truck onto the roadway. She suffered fatal injuries to her head and neck.

{¶8} On July 23, 2021, Amanda Luke, individually and as administrator of the estate of Marguerite Appel, filed a wrongful death complaint against Short Creek Joint Fire District. On September 8, 2021, an amended complaint added as defendants firefighters Chad Durbin and John Sebring. Chad Durbin, the driver, was a part-time fire captain, and John Sebring was a volunteer firefighter and paramedic, who helped arrange the "lying in state" events and was alleged to have participated in the loading of the fire truck.

{¶9} The amended complaint alleged the defendants' negligence caused Ms. Appel's death when they breached their duty by: failing to follow the fire truck's onboard

warnings; failing to properly secure Ms. Appel in the fire truck; causing and allowing the fire truck to be overloaded; failing to follow training, policies, and procedures; driving in a careless or imprudent manner; and driving too fast for the conditions. In seeking punitive damages, it was alleged the conduct showed "actual malice, reckless indifference to, or conscious disregard for the rights and safety" of Ms. Appel.

{¶10} The answer raised defenses such as primary assumption of the risk and statutory immunity under R.C. 2744.01 et seq. (immunity for political subdivision and employees). Multiple depositions were filed with the court as a result of a motion for summary judgment filed by the defense.

{¶11} Jennifer Smith, one of Ms. Appel's sisters, testified at deposition that she and Ms. Appel, while in the presence of firefighters at the viewing on the night before the funeral, discussed the idea of an honor ride in remembrance of their brother. (Smith Dep. 10, 14). Mrs. Smith said when she asked John Sebring about it, he replied, "We'll see what we can do." *Id.* at 10-11. She said when the fire truck pulled up to the station after the procession with the casket, John Sebring told her she could sit in the "seat of honor" up front where her brother would have ridden. *Id.* at 13. Mrs. Smith described Ms. Appel as excited to ride in the fire truck as a last honor for their brother, noting Ms. Appel said multiple times, "This is awesome." *Id.* 18-19. Mrs. Smith testified Frank Horton, the son of former Chief Horton, closed the subject door from the outside of the truck, emphasizing how hard and loud he closed it. *Id.* at 15. According to her testimony, Durbin's driving was regular and not reckless; there was no erratic or abrupt steering, braking, or accelerating. *Id.* at 16-18. She said the speedometer showed they were going 15 miles per hour. *Id.* at 16, 27, 35. She noted headsets and paraphernalia hanging from the ceiling prevented her from seeing into the backseat. *Id.* at 20.

{¶12} During this deposition, the parties stipulated to a video taken by Jay Coventry, which was filed with the court as an exhibit to the motion for summary judgment. The video shows parts of the services and the family boarding the fire truck; it was also discussed during the deposition of Mr. Coventry. (Ex. A to S.J. Mot.),

{¶13} Mr. Coventry testified John Sebring said the family could go on a fire truck ride. (Coventry Dep. at 52). As confirmed by his video, Mr. Coventry said Ms. Appel boarded the fire truck before his adult daughter. Ms. Appel pointed his daughter to the

empty rear-facing seat located behind the driver's position while Ms. Appel was standing in a recessed step facing that seat. When Mr. Coventry voiced the fire truck looked full, his wife and Ms. Appel said they would make room; he boarded last and sat on his daughter's lap. *Id.* at 14-18. He leaned against the subject door "from time to time" trying get everyone in his photographs and Ms. Appel did the same, testifying to his belief that Ms. Appel seemed to be sitting on a fire extinguisher when she was not standing while leaning. *Id.* at 26, 28, 59-60. Noting his unstable seating position and intermittent standing, Mr. Coventry testified the truck was not traveling at a high rate of speed and he had no sense of being jostled or losing balance from the driving, maneuvering, or braking. *Id.* at 25-27.

{¶14} During the ride, Mr. Coventry heard a sound and turned toward the door to see Ms. Appel falling backwards and reaching for him. *Id.* at 29, 62. He tried to grab her, but she fell to the road and rolled; he ended up partially hanging out of the door while his daughter grabbed him. *Id.* at 29. When he approached Ms. Appel after the truck stopped, he noticed a lot of blood coming from her head; she was not moving, but he heard a heavy gurgling breath. *Id.* at 32-33.

{¶15} After giving a statement, Mr. Coventry returned to the scene to look at the interior door handle in order to make sure he did not accidentally open the door. He observed there was "no way" he activated the handle because it was down low and would have required a person to put their hand in a pocket behind the handle before pulling. *Id.* at 34-35.

{¶16} Mr. Coventry's daughter confirmed Ms. Appel was excited about going on a fire truck ride in her brother's honor. (Kostich Dep. at 12, 14). Mrs. Kostich testified the initial plan did not include her, as she believed the ride was for the sisters of Chief Horton. *Id.* at 15, 41. She watched the others board while standing with her father. Ms. Appel, along with her two sisters who were all already loaded into the compartment, encouraged Mrs. Kostich and her father to get in the fire truck. *Id.* at 15, 41. Mrs. Kostich complied and sat in the last empty seat across from where Ms. Appel stood (while Ms. Appel assured them she was fine standing there). *Id.* at 16, 34, 40. Mrs. Kostich did not use the seat belt, and her father sat on her lap. *Id.* at 16, 22.

Case No. 24 JE 0005

**{¶17}** Mrs. Kostich testified she saw Frank Horton close the door from the outside, open it, and then close it again with more force (noting the first time was "as if you didn't close a door all the way"). *Id.* at 17-18, 45. Two bangs can be heard in Mr. Coventry's video, and then, a man in a fire department t-shirt, shorts, and a baseball hat can be seen walking away from the fire truck. (From a video still shot, this man was also identified as Frank Horton by firefighter Durbin, the driver). As confirmed by the video, Mrs. Kostich testified the driver asked if they were ready before starting to drive. *Id.* at 38. Mrs. Kostich felt no abrupt driving motions during the ride and estimated the fire truck's speed at 10 to 15 mph. *Id.* at 23-24. She said Ms. Appel remained standing in the "step or well area" by the door. *Id.* at 19-20, 25.

**{¶18}** Upon hearing the sound of the door opening, Mrs. Kostich looked over to see Ms. Appel falling backwards; she confirmed she grabbed onto her father as he lunged out to try to grab Ms. Appel. The last time she saw Ms. Appel before this, Ms. Appel was leaning against the door taking photographs. *Id.* at 25. She said the fire truck stopped almost immediately after the fall. *Id.* at 27. A very brief video taken by Mrs. Kostich at the beginning of the ride shows Ms. Appel standing with her back to the door leaning back while taking a photograph as the wind blew her hair forward so that it covered her face.

**{¶19}** Ms. Appel's daughter, Kaitlyn Warren, was one of the first people on the fire truck. She sat in a seat with one of her children on her lap and her other child sitting across from her on an uncle's lap. She testified John Sebring said multiple times that they should go for a ride. (Warren Dep. 27-28). When the fire truck returned from the procession, they "all jumped in" from the rear driver's side door (except for the front seat passenger). *Id.* at 29. Mrs. Warren said she heard her mother tell John Sebring she would take the next ride because it was too crowded but John Sebring said, "It's okay. You can fit." *Id.* at 31. On the video taken by Mr. Coventry (when Mr. Coventry was still standing outside of the fire truck), a woman voices she did not think they could all fit and a man responds, "Oh yes, you can go . . It's a fire drill everybody hop on."

**{¶20}** Mrs. Warren confirmed the door was closed, then opened, and slammed again; she said the only two people outside of the door at the time were Frank Horton and John Sebring. *Id.* at 35-36. During the short ride (estimated at one to two minutes), she believed it was "extremely bouncy" and "a little scary" on the hills and curves (noting the

hanging radio paraphernalia was "swinging through the air like crazy"). *Id.* at 41-42. She mentioned a higher speed when the gears changed but said the speed (and the steering) seemed normal. *Id.* at 42-44. She said the driver stopped immediately upon hearing the screaming. *Id.* at 47-49.

**{¶21}** Chief Manbeck, who replaced the former chief, testified fire engine 2218 was purchased in January 2019 from a fire department in West Virginia. (Chief Dep. 14). He participated in the inspection before the purchase (including opening and closing the doors). *Id.* at 11. He testified before Ms. Appel fell, he never heard about any issue with the rear passenger door latching or requiring the door to be shut twice. *Id.* at 11-12. He also said Frank Horton never had a position with SCJFD but was there often when his father previously worked at the station. *Id.* at 43.

**{¶22}** The fire chief said family members, including Ms. Appel, approached him and John Sebring to ask if they could be taken on an honor ride in Chief Horton's memory the night before the funeral, at which time he told them "not at this time." *Id.* at 23-24, 26-27, 31. He points out the authority rested with him and he thereafter told a group of firefighters on the morning of the funeral that if the family asked for a ride again, then "we would fulfill that request and let them take an honor ride." *Id.* at 27-28, 46-48.

**{¶23}** Chief Manbeck noted the department provided civilian rides in the past, such as driving the youth baseball team in a small parade when they won a championship and the softball team for a similar reason; Spiderman also rode in a fire truck for a Fourth of July parade. He was also aware such services were provided by one of the prior fire districts before the merger into a joint district. *Id.* at 37-40. He said SCJFD had no specific policy on civilian rides, seat belts, or abiding by recommendations from a named publication. *Id.* at 42, 52, 76. He pointed out state law does not require seat belts for backseat passengers and it is legal to sit on the floor in the back of the truck, regardless of what a manufacturer's warning label states. *Id.* at 53-55, 59.

**{¶24}** The fire chief also testified as the SCJFD designee. He was asked about department safety policies stating to use equipment in accordance with manufacturer instructions and the operator's manual for the fire truck stating not to ride unless properly restrained in seated positions. (Designee Dep. at 6-9, 18-19). He was aware of the manufacturer's warning on the driver's door that stated, "This vehicle has a seating

capacity of six personnel. Carrying additional personnel may result in death or serious injury." *Id.* at 9-10. He was also asked about the manufacturer's "Danger" warning on the rear door at issue that stated, "Personnel must be seated and seatbelts must be fastened while vehicle is in motion or death or serious injury may result." *Id.* at 14-15; (Durbin Dep. Ex. 13) (showing the door with sign in all caps).

**{¶25}** As designee of the fire department, the chief said the manufacturer's warnings are recommendations. He acknowledged SCJFD members were trained to abide by the warnings and should do so in non-emergency situations but said special circumstances allow them to deviate from them. *Id.* at 15-16. When asked about similar instructions in standards issued by the National Fire Protection Association (NFPA), he said these were general guidelines which did not govern and again pointed to Ohio law on passengers who are not in the front seat. *Id.* at 20-33. He also pointed out fire engines are used ceremonially in many towns in this state on the Fourth of July and he previously witnessed sports team even riding on the *outside* of fire engines multiple times. *Id.* at 39-40.

**{¶26}** Defendant John Sebring was a volunteer firefighter/paramedic for SCJFD and was considered the "safety officer on the fire scene" when he was at an emergency site. (J. Sebring Dep.4, 7-8). Being an "older veteran firefighter," he helped plan the three-day event so the former chief could be "laid in state" in the fire station's community meeting hall and a post-procession meal could be held in the station's garage (with the fire department purchasing "most of the main dinner food" and the community bringing other potluck items). *Id.* at 8, 19-20, 28, 33-34.

**{¶27}** John Sebring testified only the chief had authority to clear a ride request and he told Chief Manbeck about the family's request for an honor ride. *Id.* at 15. After the funeral procession (but before the meal) when the family was talking about a ride, he mentioned it to the chief. He said when Durbin returned from the procession and looked at him questioningly about the family's ride request, he pointed at the chief (and believed the chief spoke to Durbin about the ride). *Id.* at 14, 20-21, 24. John Sebring said he walked into the fire station before the truck prepared to leave. *Id.* at 19. He believed fire trucks had been used for civilian rides in parades in the community. *Id.* at 39. He said the ride would be considered "at-risk" and there was no policy on seat belt use. *Id.* at 44.

**{¶28}** John Sebring's son, Trevor, who was a deputy fire chief at the time, testified he knew of no issues with the door at any time. (T. Sebring Dep. at 20). He said Frank Horton had no role at SCJFD at the time. *Id.* at 43. According to Trevor, a man crying at the scene who had been in the fire truck (with a description fitting Mr. Coventry) told him Ms. Appel was standing holding the door and she grabbed the wrong handle. *Id.* at 30-32. When previously asked by the investigating trooper if the driver made the "call to take the family for a ride," Trevor answered, "Yeah, he was the operator." *Id.* at 35. However, this statement also recognized the chief may have given permission. Trevor did not believe civilians had been on rides in the past. *Id.* at 36.

**{¶29}** Defendant Chad Durbin testified at deposition that he was a part-time captain at SCJFD at the time of the funeral. He was wearing his dress uniform and had a black strap on hat "as a sign of solidarity," which is a tradition when there is a death in a fire department. (Durbin Dep.38-39). He was paid hourly but was not being paid during the funeral as he was not on the fire duty schedule that day. *Id.* at 40-41. He drove fire engine 2218 during the funeral procession.

**{¶30}** From still shots taken from Mr. Coventry's video of the funeral procession, Mr. Durbin identified former Chief Horton's son, Frank Horton, as the person in shorts who alighted from the subject door of the fire truck just prior to the procession; he could not identify a person in uniform who also used the subject door. *Id.* at 20-21. He also identified Frank Horton as the person walking away from the fire truck after the subject door was closed for the honor ride involving Ms. Appel. *Id.* at 28. Mr. Durbin testified Frank Horton had no role with the department, noting he used to stop to visit his dad and may have been on the volunteer roster before the joint fire district was created. *Id.* at 75.

**{¶31}** Mr. Durbin said he knew from a prior conversation with other firefighters, including Chief Manbeck, that the family wanted a ride in remembrance of the former chief. *Id.* at 48-50, 58. He testified he did not and could not make the "call" to take the family on the ride. *Id.* at 44. According to Mr. Durbin, John Sebring told him something along the lines of it being "okay to go ahead and do" the ride. *Id.* at 45-47.

**{¶32}** Mr. Durbin was aware of the seat belt warning sign before that day. *Id.* at 32. He was not aware of any policy on capacity or civilians on a ride. *Id.* at 63-64. He was not aware of any issue with a door latch or more than one attempt to close it. *Id.* at

55-56.  He estimated his speed at 20 to 25 miles per hour, noting it was under the speed limit.  *Id.* at 57.

**{¶33}**  Defendant Durbin was asked about a statement attributed to him in a report stating Ms. Appel "had fallen out of the rear cab of the fire engine after reportedly accidentally activating the door open handle."  *Id.* at 67.  He could not remember which family member told him she "stood up and grabbed something that she thought would have been like a grab rail . . .  and it ended up she accidentally grabbed the door latch."  *Id.* at 67-69.  After stopping the fire truck, he held pressure on Ms. Appel's neck after seeing blood flowing from her carotid artery.  *Id.* at 60-61.

**{¶34}**  Photographic exhibits were reviewed during the deposition.  One showed the positions of each family member in the back compartment during a group picture.  Another showed the interior recessed door handle, which was located below and to the left of a horizontal grab bar; the bar was just below the open door window (which was rolled down most of the way).

**{¶35}**  Ms. Appel's sister Janet testified Ms. Appel was excited about the "memorial ride."  (J. Hageter Dep. 9-13, 30-31).  But, when the fire truck was loading, she also heard Ms. Appel say something to John Sebring about there being no room and John Sebring replying to "go ahead" and get on.  *Id.* at 37-38.  As to Frank Horton closing the subject door, she said, "He closed it once and then opened it and closed it again just to be sure, and I heard it latch."  *Id.* at 22.  Mrs. Hageter sat in the rear forward-facing seat on the driver's side.  She said Ms. Appel stood next to her the entire ride with her back making contact with the door, including when Ms. Appel leaned back to take photographs, which was the last thing she noticed Ms. Appel doing.  *Id.* at 17-18.  She estimated the fire truck's speed at 15 to 20 mph with "uneventful" driving.  *Id.* at 19-20.  Mrs. Hageter noticed Ms. Appel's arm on the partway down window and believed it was near that position as she began falling.  *Id.* at 15, 18-19, 34.

**{¶36}**  Mrs. Hageter's husband testified he had the impression Ms. Appel asked for a ride to "honor" the former chief due to a conversation about it he heard between Ms. Appel and John Sebring.  (M. Hageter Dep. at 12-13, 51-52, 55).  When the fire truck returned to the station after the funeral procession, he heard John Sebring say it had been arranged for the family to have a "commemorative ride."  *Id.* at 15-16.  Mr. Hageter sat in

a seat with a child on his lap. He noted no one buckled their seat belts and he did not even think of it because he never uses a seat belt in the rear of a vehicle. *Id.* at 24. He confirmed Ms. Appel was standing in the "stepdown" or "doorwell" looking into the compartment with her back to the door, noting it was likely her back would have made contact with the door. *Id.* at 25-28. Estimating the speed at 20 mph, Mr. Hageter said the driving was slow and normal with no erratic steering or braking. He said the shifting of gears from first to second was noticeable but normal for a truck. *Id.* at 30-31.

**{¶37}** Both Hageters were asked about hearing the plaintiff say the statute of limitations for suing the manufacturer of the fire truck had expired. (M. Hageter Dep. 40-41); (J. Hageter Dep. at 21). The plaintiff, who was also deposed, agreed she discussed a potential lawsuit against the manufacturer with these relatives. (Luke Dep. 12-13).

**{¶38}** The state trooper who responded to the scene and filed a crash report was also deposed. He said if an adult refuses to wear a seat belt, the passenger would be ticketed rather than the driver, while noting a driver would be ticketed if the passenger was a child and using an example of a front bench seat with more passengers than seat belts. (Derrington Dep. 11-12). He subsequently clarified he was not speaking of ticketing a back seat passenger. *Id.* at 30. No citation was issued in the case. *Id.* at 17.

**{¶39}** This trooper reported: "The outside latch on the left rear door had 1/4 to 1/2 inch of play. The door was tested several times and was found to not latch intermittently and would have approximately 1/4 inch of play. It is not certain if this deficiency with the latch was a causative factor in this incident." *Id.* at 19. He indicated the "play" in the "latch" he was referring to referred to the movement of the door handle in its recessed socket when being pulled. He did not clearly remember the experience and said it "sound[ed] familiar" that the catch inside the door may not have allowed the door to close on some attempts. *Id.* at 19-24. He said they never determined the cause of the door opening. *Id.* at 26.

**{¶40}** Deposition testimony was also provided by a paramedic and her husband, an SCJFD firefighter and EMT (emergency medical technician), both of whom responded to the accident scene after attending the funeral. (K. Yant Dep. 20). The EMT remembered being instructed during an emergency vehicle operations course that all passengers should be seated and belted; he assumed it was required at SCJFD because

he thought it was a state law. *Id.* at 7. He also pointed out they cannot always use seat belts because at times they must stand or be unbelted while the fire engine is in motion. *Id.* at 11-12. He had experience driving fire engine 2218 while accumulating his driving hours and he was not aware of past issues with the backseat door on the driver's side. He once heard of an issue with a different door, the passenger side front door, which experienced an occasion when it would not open from the outside. *Id.* at 15-16.

**{¶41}** Another firefighter who responded to the scene testified about the hours of training required to advance through firefighter levels and said he was trained to be seated with a seat belt and instructed on NFPA standards. (Barsch Dep. at 8-11.). He noted he was the type of person who was always belted in a vehicle but opined the driver is not responsible for other occupants in the vehicle and their decisions. *Id.* at 15-16. He has driven engine 2218 and was not aware of any issue with the door. *Id.* at 20.

**{¶42}** An expert for the defense concluded Ms. Appel inadvertently pulled the inner door handle and released the latch. (Noll Dep. at 11). In coming to his conclusion, he considered his examination of the door, the location of the incident, his use of standard calculations, the witnesses' speed estimates, a video showing Ms. Appel leaning on the door, the crash report, photographs, and an accident reconstruction performed by a state trooper (who was not deposed). *Id.* at 31-41. The defense expert noted the inside door latch would have been at the level of Ms. Appel's navel. *Id.* at 81.

**{¶43}** The defense expert explained how a vehicle door has a two-stage door latch. There is an initial click (which represents the "secondary" or "half-latch" position) followed by a fully latched door. *Id.* at 20-21, 79. He noted a 1/4 inch of free play existed when the subject door was in the secondary latch position (with no play in the fully latched position). Ex. 3 (expert report). The expert emphasized how both of these positions required the door handle to be pulled in order to open the door, and the secondary position did not equate to a door that did not latch at all. *Id.* at 21, 45. He tested the door latch in the two positions, applying significant force to the inside of the door with his body without causing the door to open. *Id.* at 16, 19. He also found the door alarm associated with the subject door was working. *Id.* at 28-29.

**{¶44}** When asked about hearing the door being shut two times in Mr. Coventry's video, the defense expert reasoned the first time the door was shut, it may not have

appeared flush with the frame if only the secondary latch position resulted (such as due to a light closing or a person or object inside being in the way). *Id.* at 65. He did not interpret the trooper's mention of intermittent latching in the crash report as suggesting the door remained freely open but believed the trooper was referring to the secondary position. *Id.* at 57-58, citing Ex. 4 (crash report). The expert opined the door would have freely swung open earlier if no latch at all occurred during the door closing, especially as Ms. Appel was seen leaning on it earlier in the ride during a video. *Id.* at 61-62.

{¶45} The expert was asked if he read the following observation in the official crash reconstruction report: "the door could be latched in two positions (half latch or full latch and sealed) like most passenger vehicles. In either position it took very little manipulation of the handle to release the door." *Id.* at 78, citing Ex. 5 (crash reconstruction report issued by non-testifying trooper). He pointed out the non-testifying trooper's conclusion about the door handle requiring manipulation to release the door in either position was consistent with his own opinion. He then opined the amount of manipulation required was not abnormal, noting the trooper's reference to "very little manipulation" was subjective. *Id.* at 79, citing Ex. 5. A photograph of the handle was in evidence where it could be seen a person is expected to put their hand into a cavity to pull the vertical handle out.

{¶46} The defense expert disagreed with the reconstruction's speed estimate of 29 to 33 mph, pointing out the coefficient of friction the trooper used did not consider that Ms. Appel rolled through grass or dirt to reach the guardrail where her rolling stopped. *Id.* at 77-78. His calculations on speed were consistent with witnesses' estimates of between 15 and 25 mph. *Id.* at 31-32. In any event, the trooper did not opine his estimated speed would have been too fast, and the posted speed limit was 45 mph. *Id.* at 31.

{¶47} Relying on the depositions and some deposition exhibits, the defense filed the motion for summary judgment at issue herein, arguing the defendants were immune from liability. A challenge was made to the negligence aspect of the first two immunity exceptions in R.C. 2744.02(B), negligent operation of a motor vehicle and negligent performance of a proprietary function. In doing so, the summary judgment motion asserted: the alleged negligence did not involve the "operation" of the vehicle; there was no duty of care for any negligence claim; primary assumption of the risk barred a

negligence duty; there was no evidence of conduct reaching the level of recklessness or above; the defendants' conduct was not the proximate cause of the injury; the mere happening of an accident cannot give rise to a presumption of negligence; and the ride merely furnished the condition by which the injury was made possible when a subsequent independent act caused the injury.

{¶48} Alternatively, the motion argued political subdivision immunity would be reinstated by R.C. 2744.03(A)(5), exercise of judgment or discretion in determining how to use equipment in the absence of recklessness. As to Durbin and Sebring, the motion indicated the political subdivision employees were immune under R.C. 2744.03(A)(6) because the acts or omissions were not manifestly outside the scope of the employment or official responsibilities; the conduct was not malicious, in bad faith, or in a wanton or reckless manner; and civil liability was not expressly imposed by a statute. The motion also disputed the ability to recover punitive damages.

{¶49} In contesting these arguments, Appellee's response in opposition to summary judgment cited the depositions and attached documents to the motion. Emphasis was placed on the manufacturer warnings and NFPA standards on sitting and using seat belts. Appellee also quoted a subsection of the Ohio Administrative Code pertinent to an "automotive fire apparatus": "Seat belts shall be provided and shall be utilized by each occupant of the cab." Adm.Code 4123:1-21-04(H)(5)(a).

{¶50} Among other arguments, the reply in support of summary judgment pointed out NFPA standards were not adopted in Ohio and the cited code section says its specific "purpose . . . is to provide reasonable safety for life, limb, and health of *employees*" and "minimum requirements of an employer for the protection of such employer's employees *and no others* . . ." (Emphasis added.) Adm.Code 4123:1-21-01(A).[1] The reply also claimed the documents attached to the response in opposition to summary judgment were not properly authenticated under Civ.R. 56.

---

[1] Nevertheless, the Ohio Administrative Code citation was relevant to deposition questions about whether *firefighters* should generally use seat belts, just as the mentioning of NFPA standards was relevant to the questioning of some deponents, including a firefighter who specifically said his training discussed these standards and the use of seat belts.

**{¶51}** On the day the trial court held oral arguments on the summary judgment motion, Appellee filed a supplement authenticating the documents attached to the response in opposition to summary judgment and pointing out various documents were exhibits to (and/or quoted during) the depositions filed with the court in any event. At the oral arguments, the claim for punitive damages was withdrawn against the political subdivision but not the employees. (11/28/22 Tr. 30-31, 43). The parties filed supplemental briefs in January 2023.[2]

**{¶52}** On February 13, 2024, the court denied the motion for summary judgment except as to the issue of punitive damages on which the court granted summary judgment. The defendants (hereinafter Appellants) filed a timely notice of appeal from the denial of summary judgment, which is a final appealable order. *Hubbell v. City of Xenia*, 2007-Ohio-4839, ¶ 6-8, 27 (where the Supreme Court explained an order denying a summary judgment motion in which a political subdivision or its employee seeks immunity is a final appealable order because the benefit of immunity outweighs such an order even though it finds there is a genuine issue of material fact on immunity), citing R.C. 2744.02(C) ("An order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order.").

ASSIGNMENT OF ERROR & GENERAL LAW

**{¶53}** Appellants raise multiple arguments on immunity after setting forth the following single assignment of error:

"The Trial Court erred when it denied Appellants' motion for summary judgment filed on the basis of immunity pursuant to R.C. 2744."

**{¶54}** Pursuant to Civ.R. 56(C), summary judgment shall be granted when the evidence shows there is no genuine issue of material fact and the movant is entitled to

---

[2] Appellants' reply brief complains about the authentication of the documents attached to the response in opposition to summary judgment. However, they do not address the following points: although Appellants voiced an objection, Appellee supplemented her response to provide authentication as well as to point out various documents were exhibits to (and/or quoted during) the depositions filed with the court by Appellant; a trial court has discretion to consider unauthenticated documents or a supplemental filing when no objection is made; and the defense failed to object to the authentication supplement even though the court allowed the parties to file supplemental briefs over a month later. *See, e.g., State ex rel. Gilmour Realty, Inc. v. Mayfield Heights*, 2009-Ohio-2871, ¶ 10, 17 (where the Supreme Court concluded the trial court has discretion to consider unauthenticated summary judgment evidence if an objection is not made).

judgment as a matter of law. Summary judgment shall not be rendered unless it appears that reasonable minds can only find in favor of the movant after considering the evidence in the light most favorable to the non-movant. Civ.R. 56(C).

**{¶55}** A summary judgment movant has the initial burden of stating why the movant is entitled to judgment as a matter of law and showing there is no genuine issue of material fact. *Byrd v. Smith*, 2006-Ohio-3455, ¶ 10, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-294 (1996). The non-moving party then has a reciprocal burden. *Id.* The non-movant's response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing there is a genuine issue for trial and may not rest upon mere allegations or denials in the pleadings. Civ.R. 56(E).

**{¶56}** In reviewing an appeal of the denial of immunity, the appellate court conducts a de novo review to determine if judgment should be entered for the political subdivision on immunity as a matter of law or if there remains a genuine issue of material fact requiring "further development of the facts necessary to resolve the immunity issue." *Hubbell* at ¶ 21. The material issues of each case depend on the applicable substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Byrd* at ¶ 12.

**{¶57}** Short Creek Joint Fire District is a political subdivision. R.C. 2744.01(F). Political subdivision immunity entails three statutory tiers: (1) a general grant of immunity in R.C. 2744.02(A) applicable to both governmental and proprietary functions; (2) the exceptions in R.C. 2744.02(B) stripping the political subdivision of immunity; and (3) the defenses or immunities contained under R.C. 2744.02(B) or in R.C. 2744.03, which reinstate immunity establish non-liability. *Elston v. Howland Local Schools*, 2007-Ohio-2070, ¶ 10-13.

**{¶58}** Immunity for the employees of the political subdivision is separately addressed in R.C. 2744.03(A)(6) and does not involve the three-tier test. As used in Chapter 2744, employee is defined as "an officer, agent, employee, or servant, whether or not compensated or full-time or part-time, who is authorized to act and is acting within the scope of the officer's, agent's, employee's, or servant's employment for a political subdivision." R.C. 2744.01(B) (employee "includes any elected or appointed official of a political subdivision" but "does not include an independent contractor").

{¶59} Appellants' brief divides the arguments on political subdivision immunity into various sections: inapplicability of the first exception to political subdivision immunity under tier two as the alleged negligence did not relate to the "operation" of a motor vehicle; lack of negligence for this exception or for the second exception in tier two (negligent performance with respect to a proprietary function); lack of recklessness; and alternatively, reinstatement of political subdivision immunity under tier three due to the defense applicable to the exercise of judgment or discretion in how to use equipment or personnel. The final section of the brief addresses immunity for the employees of the political subdivision.

<u>TIER I GENERAL GRANT OF POLITICAL SUBDIVISION IMMUNITY:</u>

{¶60} Before addressing Appellant's first argument, we must address an argument raised by Appellee on tier one. This general grant of immunity provides:

> Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

R.C. 2744.02(A)(1).

{¶61} Appellee contends tier one's general grant of immunity did not apply because the function was not shown to be governmental and it was not shown to be proprietary. In other words, Appellee says R.C. 2744.02(A)(1) requires the political subdivision to demonstrate the function performed here was a governmental or proprietary function *as opposed to some other unnamed type of function that is neither governmental nor proprietary*.

{¶62} A similar argument was outlined in Appellee's opposition in response to summary judgment but only when discussing whether punitive damages were statutorily prohibited against the political subdivision under R.C. 2744.05(A), which begins with language similar to R.C. 2744.02(A)(1). The response did not make this argument in conjunction with the current position that a general grant of immunity did not apply under the tier one of R.C. 2744.02(A)(1). As acknowledged in Appellee's brief, *Appellee*

*conceded to the trial court at oral arguments on summary judgment that the honor ride was a proprietary function* (when conceding punitive damages were not warranted against the political subdivision). (11/28/24 23-24, 30-31).

**{¶63}** Nevertheless, Appellee says the de novo standard of review allows for retraction of this statement on appeal. Appellants' reply points out the de novo review (occurring in every summary judgment case) does not justify the raising of unraised issues, let alone the raising of issues conceded below. *See, e.g., Natl. College Student Loan v. Irizarry*, 2015-Ohio-1798, ¶ 31 (7th Dist.). A reviewing court can dispose of an argument contrary to a conceded position below, and we find the argument waived by Appellee.

**{¶64}** Appellants alternatively reply by claiming Appellee's argument on the tier one general grant of immunity lacks a legal basis. Appellants suggest tier one involves determining the defendant is a political subdivision and any function of a political subdivision is necessarily either governmental or proprietary. Appellants point to holdings such as: "The functions of political subdivisions are either governmental or proprietary." *Mencini v. Greater Cleveland Regional Transit Auth.*, 2023-Ohio-2299, ¶ 15 (8th Dist.).

**{¶65}** Likewise, the statutory language immediately preceding the general grant of immunity states, "For the purposes of this chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions." R.C. 2744.02(A). Appellee does not discuss this introductory language, and neither side's brief reviews the following components of the statute defining each function.

**{¶66}** A governmental function is statutorily defined as one listed in (C)(2) or one that satisfies any of the following criteria:

> (a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;

> (b) A function that is for the common good of all citizens of the state;

> (c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily

engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function.

R.C. 2744.01(C)(1). Division (C)(2) then specifically lists certain governmental functions, such as "provision or nonprovision of police, fire, emergency medical, ambulance, and rescue services or protection . . ." R.C. 2744.01(C)(2)(a).

{¶67} Appellants make no argument that acts or omissions associated with the operation of these listed departments are "in connection with" a governmental function; nor did Appellants contend that the provision of the honor ride (in a fire engine after a funeral for a retired fire firefighter held at a fire station) is "an activit[y] that is not customarily engaged in by nongovernmental persons." Likewise, Appellants' motion for summary judgment did not argue the honor ride was a governmental function. In fact, while addressing the negligent performance of a proprietary function exception to immunity, Appellants' motion at footnote 8 stated, "For purposes of this motion, Defendants concede that the honor ride was a proprietary function." Accordingly, we need not further consider the governmental function option for purposes of this appeal.

{¶68} A proprietary function is statutorily defined as a function of a political subdivision that is specified in R.C. 2744.02(G)(2) of this section or that satisfies both of the following:

(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;

(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.

R.C. 2744.01(G)(1). Division (G)(2) specifically lists certain proprietary functions of a political subdivision, such as the operation and control of a social center or the operation of a utility including a busline or other transit company. R.C. 2744.01(G)(2).

{¶69} Appellee says the honor ride should be considered a "joyride" and contends a joyride is not a proprietary function. Appellee points to ¶ 5 of the answer of the defense, which generally denied the allegations in ¶ 5 of the amended complaint. In ¶ 5 of the

amended complaint, it was stated, "at all times relevant herein" the named firefighters were "agents, servants, and employees of defendant Short Creek acting within the course and scope of that agency and employment." However, as Appellants point out in reply, although the caption of the amended complaint named John Sebring, the cited ¶ 5 spoke of *Trevor J. Sebring* (who is John's son) rather than John Sebring (who was named in the caption served with summons).

{¶70} Appellee cites a statement by Defendant Durbin, "Never", which he gave in response to a question of how often civilians ride in "your" vehicles. However, the question appeared personal to Durbin, a part-time firefighter. Contrary to Appellee's contention that there were never civilians on SCJFD fire trucks, there was evidence that youth baseball and softball teams were taken on honor rides by SCJFD.

{¶71} Appellee also highlights the chief's testimony indicating his authority to give permission for the honor ride may fall under a policy allowing him to give permission for "personal business, private use" of department equipment. (Designee Dep. at 42). Appellee claims the honor ride was not part of the organized funeral events (because the funeral procession had returned to the fire station, it was not pre-planned by SCJFD during the funeral preparations, and it should not be considered similar to an actual parade around the community). However, the honor ride occurred between the public safety vehicles' funeral procession and the department-organized funeral luncheon. The repast, held in the fire truck garage, was to be the final portion of the lying in state and funeral events.

{¶72} The fire district's use of the fire truck to provide the honor ride under the circumstances existing herein can be viewed as promoting public welfare under R.C. 2744.01(G)(1). And Appellee does not contend the providing of a ride after a funeral is not an activity customarily engaged in by nongovernmental persons (as such an argument would sound in a governmental function). We conclude the injury was alleged to be caused by any "act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function" under tier one. R.C. 2744.01(A). Regardless, as discussed above, Appellee's tier one proprietary function argument was waived. As the general grant of immunity in tier one applied, we turn to a discussion of the exceptions raised to the trial court.

<u>TIER II  EXCEPTIONS TO POLITICAL SUBDIVISION IMMUNITY:</u>

**{¶73}** The immunity granted to the political subdivision under R.C. 2744.02(A) is not absolute due to the exceptions in division (B), which are considered under tier two of the analysis. *Riffle v. Physicians & Surgeons Ambulance Serv., Inc.*, 2013-Ohio-989, ¶ 15. This division provides in pertinent part:

> a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:
>
> (1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority . . .
>
> (2) Except as otherwise provided in [non-pertinent code sections], political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions . . .

R.C. 2744.02(B)(1)[3]-(2).

**{¶74}** Both exceptions require negligence and entail an evaluation of the evidence on the elements of duty, breach, and proximate cause. *James v. New Middletown*, 2022-Ohio-4754, ¶ 19 (7th Dist.) ("In order to successfully apply the proprietary-function-negligence exception to political subdivision immunity and overcome summary judgment, the plaintiff must establish each of the elements required to sustain a negligence action: duty; breach; proximate cause; and damages."), citing *Tangler v. Village of Carrollton*, 2018-Ohio-1343, ¶ 18 (7th Dist.); *Davis v. Brown Local School Dist.*, 2019-Ohio-246, ¶

---

[3] This exception to immunity does not apply when a member of a firefighting agency was operating a motor vehicle while engaged in duty at a fire, proceeding toward a place where a fire is believed to be in progress, or answering any other emergency alarm and the operation of the vehicle did not constitute willful or wanton misconduct.  R.C. 2744.02(B)(1)(b).

46-70 (7th Dist.) (In reversing the denial of summary judgment where the trial court applied the immunity exception for negligent operation of a school bus, we reviewed duty, breach, and proximate cause when finding the political subdivision immune).

**{¶75}** Before proceeding, we explain why the door latch issue is discussed later, under the recklessness analysis. Appellants emphasize that Appellee did not plead a negligent maintenance claim about a door deficiency or show a latch issue caused the door to open, which could have introduced a manufacturer's product liability aspect to the case. Appellee told the trial court "for purposes of this case, our position is we don't care" whether the "latching issue had a causal relationship to Peggy's death and that door opening." Instead, Appellee said the evidence on the door latch was important to their recklessness argument. (11/28/22 Tr. at 28).

**{¶76}** Likewise, on appeal, Appellee does not use the door latch for proving negligence. For instance, the fact section of Appellee's brief says, "Appellee does not offer the latching deficiency evidence for the purposes of causation, but rather for the purposes of Appellants' reckless conduct . . ." (Appellee's Br. at 10-11). In later addressing the first exception to political subdivision immunity, negligent operation of a motor vehicle under R.C. 2744.02(B)(1), Appellee does not mention the door latch contention. Thereafter, in addressing negligence in general and the (B)(2) exception to immunity (negligence in a proprietary function), Appellee states, "The defective door latch, and Appellants' knowledge thereof, are probative of the issue of recklessness. It is not, however, relevant to this Court's analysis of R.C. 2744.02(B)(2) . . ." *Id.* at 25 (arguing the defense's contentions against the validity of the door latch assumptions were moot).

**{¶77}** After so stating, Appellee recognizes the elements of negligence are the same for both the first and second exceptions to political subdivision immunity and frames her negligence claims as revolving around the causing and permitting of the fire engine to be moved in violation of various safety standards on seating and seat belts. We turn to the first exception discussed by Appellants: negligent operation of a motor vehicle.

Operation of the Vehicle

**{¶78}** Prior to addressing negligence, Appellants contend the (B)(1) exception to political subdivision immunity does not apply because Appellee's allegations of negligence did not relate to the "operation" of the fire truck. For instance, Appellants say

a decision to allow an honor ride to take place and the unraised claim of negligent training do not constitute operation. They point out the evidence showed a slow speed, absence of jostling, and lack of abrupt braking, steering, or acceleration. Appellants conclude Appellee's negligence arguments on ignoring seating and seat belt standards do not relate to controlling or directing the functioning of the motor vehicle itself.

**{¶79}** Appellee emphasizes the injury occurred during the drive and would not have occurred if Ms. Appel was seated with a seat belt. Appellee cites the manufacturer warnings on doors and in the operator's manual on occupancy being limited to the number of seats, occupants being seated, and occupants wearing seat belts. Appellee also cites firefighter training and industry standards on seat belt use and department policies on following manufacturer warnings. Appellee frames the alleged "negligence in the operation" as Sebring's active loading of the fire engine despite the lack of compliance with various standards so far over the stated capacity that the plaintiff's decedent stood against a back door (with an open window) combined with Durbin's apparent reliance on Sebring's loading upon deciding to move the fire truck and then drive it down a hill on a road with a curve despite the overcrowded condition.

**{¶80}** Regarding Appellants' decision to load and then to move the fire truck, Appellants focus on the Supreme Court's statement that the term "operation" generally pertains to "controlling or directing the functioning of the motor vehicle itself." *McConnell v. Dudley*, 2019-Ohio-4740, ¶ 27, citing *Doe v. Marlington Local School Dist. Bd. of Edn.*, 2009-Ohio-1360, ¶ 20. The Court also pointed out the legislative definition of the word "operate" applicable to motor vehicles is "to cause or have caused movement of a vehicle . . ." *Id.*, citing *Doe* at ¶ 23, quoting R.C. 4511.01(HHH). It was then concluded the immunity exception in R.C. 2744.02(B)(1) for the negligent operation of a motor vehicle applies "only to negligence in driving or otherwise causing the vehicle to be moved." *Id.*, quoting *Doe* at ¶ 26.

**{¶81}** Applying this definition, the *McConnell* Court held the (B)(1) exception did not apply to an alleged violation of a duty in hiring, training, or supervising a police officer who is subsequently involved in an accident during a high-speed pursuit. *Id.* at ¶ 29-30 (where the pursuit itself would be subject to immunity under the emergency response defense to (B)(1) unless there was willful or wanton misconduct in the operation of the

vehicle). In emphasizing the evaluation looks at the driving employee's conduct, the Supreme Court pointed out "political subdivisions do not drive." *Id.* at ¶ 28-29.

**{¶82}** The cited *Doe* Court held a driver's "operation" of a school bus does not encompass other actions, such as the supervision of students on the bus (including the plaintiff who was sexually assaulted by another passenger). *Doe* at ¶ 26-29 ("it does not follow that every duty required of a school bus driver, or for which the driver is trained, constitutes operation of the school bus within the meaning of R.C. 2744.02(B)(1)"). We note both cases involved governmental functions and thus could not proceed under the (B)(2) exception to immunity for negligence in the performance of a propriety function.

**{¶83}** In a Tenth District case cited by Appellants, the plaintiff said she was in a convertible at a red light when she was sprayed in the face with a liquid that came from the engine area of an ambulance next to her; she frantically waved her hands at the ambulance to stop and help her, but the ambulance drove away even though the employee in the passenger seat looked at her. *Koeppen v. Columbus*, 2015-Ohio-4463, ¶ 3-4, 35 (10th Dist.). As the ambulance personnel's acts or omissions involved a governmental function, the plaintiff raised the immunity exception of negligent operation of a motor vehicle (and not negligent performance of a proprietary function). *See id.* at ¶ 14. The trial court denied the political subdivision's request for summary judgment based on immunity, but the appellate court reversed and remanded for judgment to be entered in favor of the political subdivision. *Id.* at ¶ 1, 49

**{¶84}** Regarding the assertion of negligence by ambulance personnel choosing to drive away from the scene with knowledge fluid sprayed on her, the Tenth District concluded driving away rather than rendering assistance is not an allegation of negligence *that occurred in the actual driving or moving of the motor vehicle*. *Id.* at ¶ 17-19, citing *Shalkhauser v. Medina*, 2002-Ohio-222, ¶ 28 (9th Dist.) (the exception for negligent operation of a motor vehicle does not apply to the decisions of police officers to initiate or to continue a high-speed chase).

**{¶85}** Regarding a separate assertion that it was negligent to drive an ambulance with a history of mechanical problems, the Tenth District addressed the question of duty, pointing out the existence of a duty is dependent on the foreseeability of the injury. *Koeppen* at ¶ 25, 28-30. After reviewing the repair records, the court found a lack of

evidence showing it was foreseeable the ambulance would spray fluid.  *Id.* at ¶ 30-36. Alternatively, the court pointed out "the mere happening of an accident or injury is not evidence of negligence."  *Id.* at ¶ 37, citing *Wise v. Timmons*, 64 Ohio St.3d 113, 116 (1992) (specific acts or omissions indicating the defendant's failure to exercise due care must be alleged to be the injury's direct and proximate cause).

{¶86}  The *Koeppen* court found the plaintiff failed to identify the malfunction that caused a spray to come from the ambulance in order to determine "what the city could have done, but did not do, to safeguard against the incident here."  *Id.* at ¶ 39 (a factfinder cannot decide if the exercise of ordinary care would have corrected the malfunction).  It was therefore concluded the plaintiff failed to provide evidence creating a question of fact on whether the city breached the standard of ordinary care.  *Id.*

{¶87}  This case relied on by Appellants does not entirely support their position on the topic of what constitutes operation of a vehicle, and they seem to rely solely on the first claim addressed by the *Koeppen* court.  The Tenth District only applied the "no operation" rationale to the claim involving medical personnel driving away *instead of rendering assistance*; the court did not apply this same no operation theory to the claim of negligence by driving the ambulance in general due to its known mechanical issues. *Koeppen*, 2015-Ohio-4463, ¶ 14-25.  On the latter claim, the court moved straight to the question of negligence under (B)(1) and thus impliedly found this instance of alleged negligence sufficiently involved "the operation" of the vehicle.  *Id.* at ¶ 24-25.

{¶88} Appellee's negligence claim involves Appellants' participation in the movement of the vehicle despite the known crowded condition resulting in a failure to utilize physical safety features of the vehicle as recommended in the multiple safety standards put in evidence.  This appears more akin to the second claim addressed in *Koeppen* than to the first claim addressed in that case.  However, we note the Tenth District's case predated the Supreme Court's *McConnell* case.

{¶89}  Appellee also suggests her negligent operation claim includes the speed of the vehicle under the circumstances of unbelted crowded passengers.  Appellants say the latter contention is pure speculation as there was no evidence of the speed being too fast.  Again, whether there was a genuine issue of material fact on negligence is

addressed under the next section. This section introduces the law on whether the allegations of negligence related to the operation of the motor vehicle.

{¶90} As explained earlier, the parties agreed the case involved a proprietary function. Regardless of whether there were sufficient allegations of negligence in the "operation" of a motor vehicle, the allegations of negligence must be addressed before the connection with "operation" could be dispositive in this appeal because (B)(2)'s negligence in a proprietary function acts as a broader exception in this case. The (B)(2) exception covers proprietary actions performed negligently, even if not necessarily occurring during the operation of a motor vehicle, which is a separate exception allowing recovery for operation of a vehicle in connection with a governmental function as well as a proprietary function. In other words, Appellants implicitly recognize we would still be addressing negligence under (B)(2) even if Appellants' operation argument under (B)(1) were to succeed.[4] Hence, we move to the crux of the matter.

Negligence

{¶91} Appellants' position is that employees who interact with passengers loaded into the back seating area of their employer's fire truck have no duty to stop the loading or refrain from driving if a passenger fails to sit in a seat or wear a seat belt (in a case where the passenger at issue urges additional passengers to enter and occupy the empty seat while said passenger occupies a position in a step-down area inside of the back door). They argue there was no duty to protect (or warn) Ms. Appel from the ordinary risks of her decision to ride inside the fire truck without taking the seat with a seat belt and argue the primary assumption of the risk doctrine applies to obviate the element of duty. *See Shaner v. Smoot*, 2001-Ohio-3429 (7th Dist.) ("The risk of hitting a tree stump is an ordinary risk of riding a motorcycle in such a location."). Appellants say Appellee relies on red herring arguments by reciting various items indicating all passengers should

---

[4] In their reply in support of summary judgment, Appellants stated, "Plaintiff focuses solely on the exception found in R.C. 2744.02(B)(1) . . . Plaintiff's Opposition focused exclusively on R.C. 2744.02(B)(1) as the lone exception to immunity." However, the cited opposition did in fact respond to the arguments which claimed neither (B)(1) nor (B)(2) applied because there was no negligence (in the operation of a motor vehicle or in performing a proprietary function). By arguing against the "no negligence" arguments, the opposition contained an argument against the contention that the (B)(2) exception did not apply due to the lack of negligence. In any event, *on appeal*, Appellants do not allege Appellee waived the (B)(2) exception by failing to specifically cite it in the opposition (or by initially alleging the function was neither governmental nor proprietary, discussed above).

wear seat belts, and they point out Ohio law does not require seat belts for back seat passengers (older than 15 years of age). R.C. 4513.263(B)(1)-(3),(C)(1); R.C. 4511.81(D).[5]

**{¶92}** Appellants additionally contend no act or omission by Appellants was the proximate cause of Ms. Appel's injury, stating their decisions merely furnished the condition by which the injury was made possible. *See Anderson v. Augenstein*, 1988 WL 116328 (3d Dist. Oct. 20, 1988) (if the negligence complained of merely furnishes a condition by which the injury was made possible and a subsequent independent act caused the injury, the existence of such condition is not the proximate cause of the injury). They highlight the excessive speculation involved in Appellee's evaluation of the elements of her claims. *See Tarpley v. Aldi Inc.*, 2013-Ohio-624, ¶ 19, 24 (2d Dist.) (proof of injury in a certain setting does not necessarily prove causation), citing *Ganoom v. Zero Gravity Motor Sports, Inc.*, 2004-Ohio-4276, ¶ 7 (6th Dist.) ("If the plaintiff's quantity or quality of evidence on the issue of proximate cause requires mere speculation and conjecture to determine the cause of the event at issue, then the defendant is entitled to summary judgment as a matter of law.").

**{¶93}** Duty, breach, and proximate cause, although separate negligence elements, are interdependent. *Hild v. Samaritan Health Partners*, 2024-Ohio-3338, ¶ 23.

> [N]egligence is a fact necessary to be shown; it will not be presumed. Thus, where liability depends upon the carelessness or fault of a person or his employees, the right of recovery must be based on competent evidence. It is incumbent on the plaintiff to show how and why an injury occurred—to develop facts from which it can be determined by the jury that the defendant failed to exercise due care and that such failure was a proximate cause of the injury.

---

[5] As to Appellee's reference to two young children on the honor ride, we note the child restraint law does not apply to public safety vehicles. R.C. 4511.81(A),(C),(D) (just as it does not apply to taxicabs); R.C. 4511.01(E)(4) (defining a public safety vehicle as a vehicle used by a fire department). In Ohio, one can even drive with passengers in the back of a truck's *unenclosed* cargo area without seat belts (under 25 mph if any passenger is under 16). R.C. 4511.51(E).

*Boles v. Montgomery Ward & Co.*, 153 Ohio St. 381, 388-89 (1950). "A probative inference for submission to a jury can never arise from guess, speculation or wishful thinking. The mere happening of an accident gives rise to no presumption of negligence." *Parras v. Standard Oil Co.*, 160 Ohio St. 315, 319 (1953).

**{¶94}** "Under the law of negligence, a defendant's duty to a plaintiff depends upon the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position . . . Injury is foreseeable if a defendant knew or should have known that its act was likely to result in harm to someone." *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645 (1992). "Once the existence of a duty is found, a defendant must exercise that degree of care which an ordinarily careful and prudent person would exercise under the same or similar circumstances." *Huston v. Konieczny*, 52 Ohio St.3d 214, 217 (1990).

**{¶95}** Although there is no specific formula for determining whether a duty arose, "[t]he existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989). As the Supreme Court emphasizes, primary assumption of the risk is a no duty rule. *Horvath v. Ish*, 2012-Ohio-5333, ¶ 18 The Court also noted courts do not always expressly announce the application of a primary assumption of the risk doctrine even when they are obviously applying it by finding no duty in a negligence case. *Gentry v. Craycraft*, 2004-Ohio-379, ¶ 11. If the primary assumption of the risk doctrine applies, recovery requires evidence the defendant's conduct was reckless (or intentional). *Id.* at ¶ 13.

**{¶96}** Initially, we must address Appellee's argument that we cannot even address primary assumption of the risk in evaluating the duty element of negligence because the appeal is limited to the denial of immunity. Appellee cites a case generally stating the immunity appeal does not open the door to all interlocutory issues and permit the court to reach the merits of the case. *See Brown v. Cincinnati*, 2020-Ohio-5418, ¶ 6-7 (1st Dist.). However, the cited case is distinguishable as it concluded the immunity appeal could not address the denial of the political subdivision's motion for summary judgment on the plaintiff's replevin claim because immunity was not applicable to that claim. *Id.* at ¶ 7-13.

**{¶97}** The denial of summary judgment is generally not a final, appealable order over which a court of appeals has jurisdiction to immediately review. *Hubbell v. Xenia*, 2007-Ohio-4839, ¶ 9. However, there is a statutory exception to this rule in an immunity

case: "An order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order."  R.C. 2744.02(C).  Accordingly, the political subdivision and its employees are granted the right to file an interlocutory appeal from a trial court decision finding a genuine issue of material fact on an immunity element and denying their Civ.R. 56(C) motion for summary judgment seeking immunity.  *Hubbell* at ¶ 12, 20-21, 27 (emphasizing the statutory words "benefit" and "alleged").

**{¶98}** Although the denial of summary judgment on immunity is immediately appealable by the political subdivision despite it not being a final denial of immunity, this does not permit the appeal to raise all topics addressed in the summary judgment proceedings below.  *Riscatti v. Prime Props. Ltd. Partnership*, 2013-Ohio-4530, ¶ 19 (where the Supreme Court reasoned, "a statute-of-limitations defense does not deny the benefit of immunity and is not a final, appealable order even though it arose along with a political subdivision's immunity claim").  However, the Supreme Court has observed, "concepts related to duty and breach . . . are part of the statutory-immunity standards . . ."  *Argabrite v. Neer*, 2016-Ohio-8374, ¶ 10.  Additionally, the Supreme Court's finding of appellate jurisdiction to review the denial of summary judgment in *Hubbell* was made in a case where the political subdivision sought immunity because negligence was lacking under tier two.  *Hubbell* at ¶ 3.  The Court reversed the appellate court's dismissal of the appeal and remanded without limiting the appeal to the political subdivision's tier three argument.  *Id.* at ¶ 27.

**{¶99}** As this district has pointed out, we have jurisdiction to "review an interlocutory decision on whether there was a genuine issue of material fact on the political subdivision's negligence when the pertinent exception to immunity so requires."  *McCullough v. Youngstown City School Dist.*, 2019-Ohio-3965, ¶ 25 (7th Dist.) (addressing the duty of school bus driver in rejecting negligent operation of motor vehicle exception in an appeal from the denial of summary judgment), citing, *e.g., Davis*, 2019-Ohio-246, at ¶ 46-49, 70 (in an appeal from the denial of summary judgment, we reviewed duty, breach, and proximate cause when considering immunity of political subdivision for negligent operation of a school bus); *Tangler*, 2018-Ohio-1343, at ¶ 18 (7th Dist.) (evaluating the elements required to sustain a negligence action in the trial court's

Case No. 24 JE 0005

application of the negligent proprietary function exception to immunity in denying the political subdivision's motion for summary judgment).

**{¶100}** After addressing foreseeability for the duty element, we noted the political subdivision could not use an interlocutory appeal to raise issues unrelated to the denial of immunity, such as contributory or comparative negligence. *McCullough* at ¶ 25, fn. 1, 58, fn. 4, citing *Sickles v. Jackson Cty. Hwy. Dept.*, 2011-Ohio-6102, ¶ 4-5, 21-30 (4th Dist.) (addressing duty and foreseeability as to the claimed negligent operation of a salt truck but refusing to address whether contributory negligence barred recovery). Notably, when the Supreme Court merged the concept of secondary assumption of risk with comparative negligence, the Court specifically declared that *primary assumption of the risk would not be so merged. Anderson v. Ceccardi*, 6 Ohio St.3d 110, 113 (1983) (also stating express assumption of the risk was not merged with comparative negligence).

**{¶101}** Due to the no duty feature of the primary assumption of the risk doctrine, the defense is different than a typical affirmative defense that argues the plaintiff cannot recover even if the plaintiff can establish a prima facie case of negligence. *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 431 (1996). Because primary assumption of the risk is a no duty rule, it follows that its application can be addressed when considering the topic of duty in the political subdivision's appeal of the denial of immunity. In accordance, the applicability of the doctrine is subject to review in this appeal just as duty is subject to review.

**{¶102}** As to the primary assumption of the risk doctrine, the Supreme Court has explained that a participant (or spectator) in a recreational activity accepts the associated risks so that if an injury results from conduct which is a foreseeable, customary part of the activity, there is no duty owed to protect the victim from the conduct. *Gentry*, 2004-Ohio-379, at ¶ 10. The risk covered by primary assumption of the risk doctrine must be inherent in the particular activity at issue such that it cannot be eliminated. *Horvath*, 2012-Ohio-5333, at ¶ 1.

**{¶103}** Primary assumption of the risk applies even when the participant is "entirely ignorant" of the activity's risk: "The law simply deems certain risks as accepted by plaintiff regardless of actual knowledge or consent." *Gentry* at ¶ 11-12 (while secondary or implied assumption of the risk evidence the plaintiff knew about or

appreciated the risk in acquiescing to it). In *Gentry*, the Supreme Court found a four-year-old child primarily assumed risk of a spectator of backyard play involving other children hammering nails into a chair. *Id.* at ¶ 14.

**{¶104}** In arguing there was no duty to protect (or warn) Ms. Appel from her decision to ride just inside the door of the fire truck without taking the seat with a seat belt, Appellants cite examples of various cases applying the primary assumption of the risk doctrine to eliminate duty as a matter of law. In one case, the court concluded the plaintiff's participation in riding on a moving flat aluminum trailer while sitting on a wooden folding chair was inherently dangerous and the plaintiff assumed the risk of being thrown from the trailer when the truck hit a pothole *See, e.g., Wagner v. Kretz*, 2017-Ohio-8517, ¶ 20 (3d Dist.). In another case, the court pointed out a passenger's participation in riding on a the lid of a car's trunk was inherently dangerous with certain associated risks that cannot be eliminated, and thus, the student's claim against the school district and a fellow student who was driving was barred by the primary assumption of the risk doctrine. *Cave v. Burt*, 2004-Ohio-3442, ¶ 19 (4th Dist.).

**{¶105}** *At the very least, these riders assume the risks of normal driving movements incurred as a result of the position they placed themselves, even if they do not assume the risk of abnormal driving movements.*

**{¶106}** As Appellants point out here, any suggestion by Appellee that the speed of the fire truck may have been too high for the circumstances was pure speculation as there was no evidence of this. The defense expert calculated the speed estimate at 15 to 25 mph, pointing out this was consistent with all witness statements. For instance, Ms. Appel's sister, who occupied the front seat passenger position testified she looked at the speedometer and saw they were only traveling at a speed of 15 miles per hour on this very brief ride covering less than a half of a mile. The non-testifying trooper's reconstruction estimate of a speed of 29 to 33 mph was disputed by the defense expert (due to the use of a coefficient in the calculation that did not account for the surface material changes). In any event, he did not testify or suggest the estimated speed in a 45 mph zone was too fast under the circumstances (including witness agreement on the lack of sudden driving movements). Appellee provided no expert opinion on the allegation of negligently high speed. "A probative inference for submission to a jury can never arise

Case No. 24 JE 0005

from guess, speculation or wishful thinking. The mere happening of an accident gives rise to no presumption of negligence." *Parras v. Standard Oil Co.*, 160 Ohio St. 315, 319 (1953).

**{¶107}** In addressing the lack of duty in general, it has been held that a driver who was not at fault in causing a collision did not have a legal duty to ensure the child in her backseat was using her seatbelt before moving the vehicle. *Howard v. Kirkpatrick*, 2009-Ohio-3686, ¶ 15 (12th Dist.) (before changes to the child restraint law). Contrary to Appellee's concern with hypothetical situations, the application of primary assumption of the risk to find no duty on the part of those providing the ride here would not relieve a non-participating outside party from liability for negligence (such as if a vehicle negligently crashed into the side of the fire truck causing Ms. Appel to fly through the door or window). The doctrine does not relieve unrelated intrusive third-parties acting external to the activity at issue.

**{¶108}** Contrary to Appellee's other suggested concerns, the doctrine would not relieve a ride provider from non-inherent risks or those involving a defendant's act that is not a foreseeable, customary part of the activity. *See Horvath* at ¶ 1; *Gentry* at ¶ 10. The doctrine would not apply to eliminate a duty if, for example, the loading assistant told the driver to leave and the driver took off while the passenger was still stepping into the vehicle through an open door.

**{¶109}** "[T]here are risks that are inherent in an activity and those that are not. *West v. Devendra*, 2012-Ohio-6092, ¶ 25 (7th Dist.) (pointing to the inherent risks of ATV riding where the plaintiff claimed the driver did not follow manufacturer instructions), citing *Byer v. Lucas*, 2009-Ohio-1022 (7th Dist.). In *Bye*r, we indicated the inherent risks of a recreational hayride may include getting scratched by branches, being bounced around, and even falling off the wagon after losing one's balance due to the ordinary aspects of the ride. *Id.* at ¶ 30, 39 (then finding the risk inherent in the ride did not include a wagon careening uncontrolled down a steep hill causing passengers to be violently ejected from the wagon due to its jackknifing after the driver chose to leave the designated route).

**{¶110}** We conclude various policies or best practice standards on all passengers wearing seat belts and the vehicle manufacturer warnings about seat belts and capacity (which matches the provided number of seats with seat belts) do not give rise to a duty

by those loading and driving the vehicle to refrain from loading or driving due to the failure of an independent adult passenger to occupy an available seat with a seat belt. Although Appellee does not claim a special duty, Appellee's reliance on the various standards is an attempt to impose additional duties on firefighters during non-emergency rides with regard to backseat passengers above that of other drivers. The standards cited by Appellee all revolve around well-known safety concerns that the adult passengers obviously knew for themselves: seat belts save lives.

{¶111} Appellants had no duty to Ms. Appel to refrain from loading or moving the vehicle under the circumstances relied upon here. The cited operation of the motor vehicle and performance of the proprietary function would not constitute the breach of a duty that proximately caused the injury to Ms. Appel.

{¶112} Upon so stating, we also specifically reiterate the well-established principle that the primary assumption of the risk doctrine is a no duty rule. *Horvath*, 2012-Ohio-5333, at ¶ 18 (pointing out many courts find no duty in a negligence case without mentioning or realizing they are applying the doctrine). The primary assumption of the risk doctrine can be applied in summary judgment proceedings when the injury was the result of "that specific" risk directly associated with the activity in question. *Gallagher*, 74 Ohio St.3d at 432 (as opposed to some other risk or attendant circumstance). As pointed out above, it is the specific risk that is evaluated.

{¶113} We conclude a person voluntarily riding in a crowded fire truck after choosing to occupy the space by the door without a seat or seat belt and then encouraging more passengers to enter instead of taking the empty seat, *primarily assumes the specific risk* of falling out if they lean on the door as the truck navigates a curve after the door handle is accidentally activated by the plaintiff (or another person).[6] (As for any speculation the door may have opened on its own, as noted above, Appellee says this is a subject for the recklessness analysis below.)

{¶114} Accordingly, the primary assumption of the risk doctrine precludes a finding of negligence here. This leads to the analysis of recklessness. *Gentry*, 2004-Ohio-

---

[6] Similarly, the occupant standing up from his adult daughter's lap and leaning backwards against the door area to take photographs would have assumed any risk of falling through the open window had he performed these motions as the fire truck rounded the curve.

379, at ¶ 11 (if the primary assumption of the risk doctrine applies, recovery requires evidence the defendant's conduct was reckless or intentional).

Recklessness

**{¶115}** Appellants' motion for summary judgment acknowledged that if primary assumption of the risk applied, Appellee could still recover by setting forth evidence of recklessness (or a higher standard of intent). In response, after arguing primary assumption of the risk did not apply, Appellee argued Appellants recklessly failed to eliminate the risk to Ms. Appel.

**{¶116}** In addition to addressing recklessness for this purpose, this discussion will also be relevant to Appellee's argument of recklessness under two other sections set forth below. That is, if a political subdivision loses immunity under tier two and attempts to recapture it under tier three by claiming the injury allegedly resulted from the exercise of judgment or discretion, then recklessness will preclude reinstatement of immunity. R.C. 2744.03(A)(5). And recklessness can be used to recover against a political subdivision employee who claims immunity. R.C. 2744.03(A)(6).

**{¶117}** These two statutory subdivisions use the phrase "with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(5),(6). All four standards "are rigorous standards that will in most circumstances be difficult to establish . . ." *Argabrite*, 2016-Ohio-8374, at ¶ 8, 25 (where the Supreme Court said even assuming the police department's pursuit policy was violated, this would not create a genuine issue of material fact as to whether the violator acted in a wanton or reckless manner in the absence of evidence the violator was aware his conduct would in all probability result in injury).

**{¶118}** Initially, we point out Appellee's brief refers to conduct performed in a wanton or reckless manner. Appellants say the wanton standard was not preserved below (nor was the bad faith standard). The amended complaint generally alleged "actual malice, reckless indifference to, or conscious disregard for the rights and safety of" Ms. Appel. Appellee's oral argument to the trial court pointed out "malicious intent" need not be demonstrated and focused on recklessness. (11/28/22 Hrg. Tr. 24-25, 28-30). This corresponded to Appellee's opposition to summary judgment where *only recklessness* was discussed in contesting the assertion of immunity. (Opp. to S.J. at 19, 22-23).

Appellee's opposition did not argue the acts or omissions were wanton (or malicious or in bad faith) in addressing the immunity statutes or primary assumption of the risk.[7]

**{¶119}** As acknowledged by Appellee, the Supreme Court emphasizes that a wanton manner is different from a reckless manner as the terms are used in the immunity statutes. *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 33. Wantonness "is the failure to exercise *any* care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." (Emphasis added.) *Id.*

**{¶120}** Recklessness "is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at ¶ 34. Distilled to its essence, the indifference required for recklessness has been described as a "perverse disregard" of a known risk. *O'Toole v. Denihan*, 2008-Ohio-2574, ¶ 73 (in the context of employee immunity).

**{¶121}** "Although the determination of recklessness is typically within the province of the jury, the standard for showing recklessness is high, so summary judgment can be appropriate in those instances where the individual's conduct does not demonstrate a disposition to perversity." *Id.* at ¶ 75 (finding a children services intake supervisor was immune as her conduct was not reckless in failing to remove a child with suspicious injuries from the home; reversing the appellate court's decision which found there was a genuine issue of material fact on recklessness). "[I]t is well established that the violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct." *Anderson*, 2012-Ohio-5711, at ¶ 37. Still, for the violation to satisfy a reckless disregard standard, there must be an intentional violation with knowledge the violation will in all probability result in injury. *Id.* at ¶ 38-39.

---

[7] We note by statute, the political subdivision was not subject to punitive damages; however, this statute does not protect employees. R.C. 2744.05(A). The trial court granted summary judgment for all defendants on the claim for punitive damages. A punitive damages claim can rely on extreme recklessness, which involves "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, 335-336 (1987) (instead of the other actual malice test for punitives involving a "state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge"). In arguing there was a genuine issue on punitive damages, Appellee's opposition cited this recklessness standard. (Opp. to S.J. at 23-24).

**{¶122}** In arguing recklessness, in addition to loading people into the back of the fire truck and the driving of the fire truck in disregard of the occupancy, seat, or seat belt standards, Appellee cites to the door latch issue. As discussed near the beginning of the tier two analysis above, Appellee says she was only using the door latch issue as evidence of recklessness.

**{¶123}** Prior to discussing the door latch issue, we must first address Appellant's challenge to the following hearsay statement in Mr. Coventry's deposition testimony: "[Frank Horton] said that he was glad that I was all right because he saw that I was the last one on the fire truck and they've been having trouble with that door." (J. Coventry Dep. at 36). We begin by noting Frank Horton's alleged statement was not specific as to person, time, or issue. If Frank Horton made the statement that Mr. Coventry was "almost sure" he made, he may have been speaking about his own perceived "trouble" with shutting the large door (when he closed it just after the family boarded for the post-procession honor ride). Or, Frank Horton may have been speaking about hearing about trouble with door from yet another (unidentified) person, creating an additional layer of hearsay.[8]

**{¶124}** Appellants point out Appellee failed to depose or obtain an affidavit from her cousin, Frank Horton, after Mr. Coventry gave this testimony in order to show there may have been a past issue with the door known by the fire department (or to provide evidence Frank Horton had an affiliation with the fire department to contradict the chief's testimony that he never had an affiliation with SCJFD). Appellants conclude Frank Horton's statement cannot be considered in evaluating the existence of a genuine issue of material fact because it was hearsay and thus not competent summary judgment evidence.

**{¶125}** Although Appellee alludes to Frank Horton possibly being a volunteer firefighter, the evidence did not demonstrate he was a firefighter for or affiliated with SCJFD (formed in 2017), most particularly in 2019 between the purchase of fire engine 2218 and the honor ride at issue. *Shreves v. Meridia Health Sys.*, 2006-Ohio-5724, ¶ 23

---

[8] From the rest of Mr. Coventry's sentence, one notices he was recapping a statement and was not claiming to directly quote Frank Horton's use of pronouns (just as he changed Frank's use of "I" to "he," Mr. Coventry may have changed Frank's use of "we" to "they").

(8th Dist.) (where the plaintiff opposed summary judgment by pointing to hearsay in her deposition testimony, she had the burden to show admissibility under Evid.R. 801(D)(2)(d) as a statement by the party-opponent's agent or employee during the existence of the relationship on a matter within the scope of employment or agency). In fact, Appellee's counsel informed the trial court that he did not think Frank Horton had a position with SCJFD (believing he was a volunteer firefighter with a different department before the merger). (11/28/22 Tr. at 27). In any event, Appellee has not claimed Frank Horton's statement was one by a party opponent under Evid.R. 801(D)(2).

{¶126} Rather, Appellee's response to the hearsay argument is that Frank Horton's statement to Mr. Coventry was admissible under the excited utterance hearsay exception applicable to a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). In order for an excited utterance to be admissible, four factors must be satisfied: (1) the event must be startling enough to produce a nervous excitement in the declarant; (2) the statement must have been made while the declarant was still under the stress of excitement caused by the event; (3) the statement must relate to the startling event; and (4) the declarant must have personally observed the startling event. *State v. Taylor*, 66 Ohio St.3d 295, 300-301 (1993).

{¶127} As Appellants point out, Frank Horton was not a witness to Ms. Appel's injury. (Nor is there an indication he traveled to the scene after the incident.) Mr. Coventry said he heard the statement when he returned to the fire station after the incident, suggesting it was after he gave his initial statement to the trooper who responded to the scene. We also note it could have been even later, after Mr. Coventry returned from the scene the second time (after he went to view the door handle's location in order to counter questions on whether he may have accidentally grabbed the handle during the ride). In addition to not personally observing the startling event, there is no indication the declarant (Frank Horton) was still under the stress of excitement caused by the startling event at the time Mr. Coventry heard it. Accordingly, it did not fall under the excited utterance hearsay exception.

{¶128} In accordance with Ohio Supreme Court law, summary judgment evidence making factual claims based on hearsay are improper and can be objected to as

inadmissible when no exception applies. *Salemi v. Cleveland Metroparks*, 2016-Ohio-1192, ¶ 20 (the non-movant cannot rely on an affidavit that depends on hearsay to challenge movant's affidavits in support of summary judgment); *Burkhart v. H.J. Heinz Co.*, 2014-Ohio-3766, ¶ 35-38 (deposition testimony in a prior case did not satisfy hearsay exclusion for former testimony and was thus inadmissible summary judgment evidence); *State ex rel. Duncan v. Middlefield*, 2008-Ohio-6200, ¶ 23 (disposing of one of the non-movant's factual assertions because it "was based on hearsay rather than admissible evidence"); *see also* Civ.R. 56(E) ("Supporting and opposing affidavits . . . shall set forth such facts as would be admissible in evidence").

{¶129} Appellants' reply in further support of summary judgment objected to the opposition's reliance on Mr. Coventry's testimony on Frank Horton's hearsay (possibly double hearsay) statement. Although Appellee filed a supplement to her opposition due to the reply's arguments about authentication of other pieces of evidence she relied on, her supplement did not attempt to respond to this hearsay objection. Appellee did not provide an affidavit from Frank Horton, explain the lack of evidence from him on this important topic, or seek an extension to obtain his statement through affidavit or deposition. Although Mr. Coventry's testimony repeating hearsay was properly elicited at the discovery deposition in order to investigate other witnesses to depose or to interview for affidavits, this hearsay could not be used to help create a genuine issue of material fact on the matter of the door latch after the objection to it was lodged by Appellants. *See id.*; *Pearl v. City of Wyoming*, 2013-Ohio-2723, ¶ 13 (1st Dist.) (hearsay in deposition testimony cannot be considered at summary judgment stage absent an exception). Accordingly, we shall not consider Frank Horton's purported statement when evaluating whether there was a genuine issue of material fact for trial.

{¶130} We therefore turn to the other evidence about the door. Appellee points to Mr. Coventry's video where two bangs can be heard before the ride began corresponding to testimony that Frank Horton shut the door, opened the door, and shut it again. We recap that evidence.

{¶131} After the two bangs, a man can be seen walking away from the fire truck. Durbin identified this man (from a video still shot) as Frank Horton. Ms. Appel's daughter, seated near the door on the opposite side of the truck, testified the door was closed,

opened, and closed again, all from the outside. (Warren Dep. at 35-36). Mrs. Kostich testified to watching Frank Horton close the door from the outside, open it, and then close it again with more force (noting the first time he closed it "was as if you didn't close a door all the way"). *Id.* at 17-18, 45. Ms. Appel's sister, who sat in the seat next to the space occupied by Ms. Appel, testified Frank Horton "closed [the door] once and then opened it and closed it again just to be sure, and I heard it latch." *Id.* (J. Hageter Dep. at 22).

**{¶132}** Although witnesses testified Frank Horton shut the door twice just prior to the honor ride commencing, they were not aware of why Frank Horton opened the door and shut it a second time. Multiple fire department employees testified they were not aware of any issue with the door.

**{¶133}** The first-responding trooper and the defense expert testified about their personal closing of the door after the accident and finding it intermittently failed to fully latch. The defense expert testified the half-latch position still required activation of the door handle in order for the door to open. He noted this was consistent with a non-testifying trooper's finding in the official reconstruction report, marked as an exhibit to his deposition. The testifying trooper did not come to a conclusion that the intermittent door issue he noticed caused the accident. Even upon applying significant force to a half-latched door from the inside, the defense expert was unable to unlatch the door without specifically activating the door handle.

**{¶134}** As Appellants point out, Appellee did not provide an expert opinion on whether the secondary latching issue could have allowed the door to open. Such testimony was warranted in order to contradict the opinion of the defense expert that Ms. Appel activated the door handle because both the fully latched and half-latched (secondary) positions would have required a person to activate the door handle in order for the door to open. As emphasized by the defense expert, Ms. Appel leaned on the door without it opening earlier in the ride (according to witness testimony and a video).

**{¶135}** Appellants urge it is pure speculation to conclude a person shutting a door twice is indicative of a defect with the door (even if there had been evidence that the reason he shut it the second time was because he noticed his first closing of the door did not result in the door sitting fully flush with the frame). As they argued to the trial court, car users commonly fail to shut a car door fully due to insufficient force applied. The fact

that this may have occurred on the shutting of a large fire engine door does not give rise to a presumption of a door issue. Likewise, a common user may open a door after shutting it or attempting to shut it if personal belongings are hanging out of or blocking the door. In the face of such ordinary occurrences, a non-movant's speculation on possibilities or unsupported conclusory assertions do not give rise to a genuine issue for trial. *Miller v. Transp. Office, Inc.*, 2024-Ohio-1104, ¶ 12 (7th Dist.). *See also Parras*, 160 Ohio St. at 319 ("A probative inference for submission to a jury can never arise from guess, speculation or wishful thinking. The mere happening of an accident gives rise to no presumption of negligence.").

**{¶136}** As discussed above, it was not negligent to allow people to ride in the back of a fire truck for a short and slow ride without seat belts notwithstanding door labels and various policies warning about the importance of seat belt use. The addition of evidence about intermittent half-latching upon post-incident closing attempts would not change the analysis on duty, breach, and proximate cause, as speculation was the main basis for the opposition to summary judgment on this door latch topic.

**{¶137}** There is no evidence SCJFD was aware an issue with the door latch made it foreseeable the door would open while driving. Even if one were to assume a firefighter had knowledge of a reclosing of the door to obtain a full latch flush with the door frame (just prior to this honor ride or even at some time in the past), knowledge of a half-latch position on initially attempting to shut a door, which prompts a reshutting of the door, does not allow a reasonable person to find the door was faulty or SCJFD was reckless. Accordingly, competent evidence would not support a reasonable conclusion that SCJFD displayed "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *See Anderson* at ¶ 34.

**{¶138}** Lastly, although Appellee reserved the door latch issue for the recklessness analysis, we nonetheless observe the issue would not have raised a genuine issue of material fact on the lower standard of negligence either due to the lack of proximate cause and breach of duty. The evidence did not demonstrate the foreseeability of a door opening merely because it may have needed to be shut twice. In accordance, the political subdivision was entitled to immunity.

Case No. 24 JE 0005

## TIER III REINSTATMENT OF POLITICAL SUBDIVISION IMMUNITY:

**{¶139}** Tier three considers the statutory "defenses or immunities" the political subdivision may assert "to establish nonliability" and thereby reinstate the general immunity granted in tier one if an exception in tier two applied. In this section, Appellants alternatively argue that even if a tier two exception applied, political subdivision immunity was reinstated under tier three. As we found political subdivision immunity above, we need not proceed to address this tier three argument. However, we shall explain why we would not have adopted Appellants' tier three argument that the political subdivision is immune:

> if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

R.C. 2744.03(A)(5).

**{¶140}** Appellants focus on the decision to allow the honor ride by stating, "The decision to allow the ceremonial honor ride constituted Short Creek's judgment decision on how to use personnel (Durbin) or equipment and other resources (fire truck)." However, Appellee does not contend the decision to allow the honor ride in the first instance would fall outside of (A)(5)'s judgment or discretion (in determining how to use equipment, personnel, or other resources). Rather, Appellee contends the conducting of the ride in violation of "mandatory" safety rules did not involve the "public policy making discretion contemplated by R.C. 2744.03(A)(5)."[9]

**{¶141}** Appellee points to a case from our district observing tier three defenses should be read narrowly so they do not nullify the tier two exceptions to immunity. *Aratari*

---

[9] Appellee alternatively argues even if the injury "resulted from the exercise of judgment or discretion" in determining how to use equipment under (A)(5), the judgment or discretion was exercised in "a wanton or reckless manner" and thus (A)(5) would still not apply. Appellee refers us to the section of the brief discussing recklessness. If we had been required to proceed to this analysis in tier three, we would likewise refer to our analysis of recklessness, which is discussed after primary assumption of the risk doctrine above and under the employee immunity section below.

*v. Leetonia Exempt Village School Dist.*, 2007-Ohio-1567, ¶ 56 (7th Dist.). We broadly indicated the term "discretion" in both (A)(3)[10] and (A)(5) involved "policy-making and independent judgment." *Id.* at ¶ 57 (but then concluded both defenses provided immunity where the claim involved the school district failing to supervise a troublesome student more intensively). However, we must point out (A)(5) does not use the term policy-making while (A)(3) specifically does. *Compare* R.C. 2744.03(A)(3) *to* (5).

**{¶142}** Appellee also cites a Supreme Court case concluding the (A)(5) immunity did not apply where a school principal made a decision to use the school janitor to repair a leaking drinking fountain prior to calling a professional plumbing service because: "[T]he decision of whom to employ to repair a leaking drinking fountain is not the type of decision involving the exercise of judgment or discretion contemplated in R.C. 2744.03(A)(5). Such a decision, under the facts of this case, is a routine maintenance decision requiring little judgment or discretion." *Perkins v. Norwood City Schools*, 85 Ohio St.3d 191, 193 (1999) (after indicating the elimination of hazards does not involve "a high degree of judgment or discretion"). The acts or omissions at issue here (occurring after the decision to allow a ride), likewise appear to be "routine" decisions "requiring little judgment or discretion."

**{¶143}** As Appellants point out, a more recent Supreme Court case applied (A)(5) immunity to a school where its baseball coach told the players to use an indoor batting cage without instructing on or ensuring the use of protective gear (screen or helmets). *Elston,* 2007-Ohio-2070, ¶ 5, 20, 26. The Court noted political subdivision employees such as teachers and coaches have wide discretion under (A)(5) of R.C. 2744.03 to determine the level of supervision necessary to ensure the safety of those in their care. *Id.* at ¶ 20. The Court favorably cited an appellate case applying (A)(5) immunity where students injured another student during a student council meeting after a teacher left them in her classroom unsupervised to attend a faculty meeting. *Id.* at ¶ 20-21, citing *Marcum v. Talawanda City Schools*, 108 Ohio App.3d 412, 414-416 (12th Dist. 1996) (teacher's

---

[10] R.C. 2744.03(A)(3) provides tier three immunity "if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee."

decision to leave the students unattended was within the scope of her discretionary authority).

**{¶144}** After finding the school district immune for the baseball coach's alleged negligence under (A)(5), the Supreme Court continued its analysis in order to explain the school would not be immune under (A)(3). The Court pointed out: "Although both R.C. 2744.03(A)(5) and 2744.03(A)(3) concern an employee's discretionary acts, the focus of subsection (A)(3) is that the employee be engaged in policy-making, planning, or enforcement." *Elston*, 2007-Ohio-2070, at ¶ 27. Under the (A)(3) analysis, it was then concluded: "there is no showing that [the employee's] position as baseball coach involved policy-making, planning, or enforcement powers. His position as a baseball coach, without more, does not involve 'the exercise of a high degree of official judgment or discretion'." *Id.* at ¶ 30. Accordingly, a test involving "policy-making" and "high degree of official judgment or discretion" with respect to the position is distinct from the test employed in (A)(5) involving judgment or discretion in determining how to use equipment. *Compare id.* at ¶ 26 *to* ¶ 30.

**{¶145}** The fire department's decision to grant permission to conduct the honor ride would qualify as "the exercise of judgment or discretion in determining . . . how to use . . . equipment . . . personnel . . . and other resources" if that were the decision at issue. (This position does not appear to be disputed by Appellee).

**{¶146}** However, the decision alleged to have caused the injury is about the subsequent "decision" to encourage additional passengers boarding and the "decision" to drive the vehicle, rather than protest the passenger-to-seat ratio. Firefighters participating in transporting ride passengers despite the passengers' nonuse of seat belts (as encouraged in various safety manuals or policies) may not be comparable to the wide judgment or discretion the Supreme Court found teachers and coaches have to determine the level of supervision necessary to ensure the safety of children who they are in charge of supervising. *Compare Elston*, 2007-Ohio-2070, ¶ 20.

**{¶147}** Furthermore, after the discretionary decision was made to allow the ride, the loading and driving of the equipment in this case would not appear to constitute "the exercise of judgment or discretion *in determining . . . how to use* . . . equipment" (or other resources) (Emphasis added.) R.C. 2744.03(A)(5). The allegations on boarding and

driving are not about "how to use" the fire truck. Therefore, although this alternative argument is moot considering our ruling in prior sections, if we had been required to reach this stage of the immunity analysis, we would have overruled Appellants' tier three argument.

EMPLOYEE IMMUNITY

**{¶148}** The three-tiered test is not involved in considering employee immunity, which is instead covered by a distinct statutory division stating the employee is immune from liability unless one of the following applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code . . .

R.C. 2744.03(A)(6).[11]

**{¶149}** As used in Chapter 2744, employee is defined as "an officer, agent, employee, or servant, *whether or not compensated* or full-time or part-time, who is authorized to act and is acting within the scope of the officer's, agent's, employee's, or servant's employment for a political subdivision." (Emphasis added). R.C. 2744.01(B) (but "does not include an independent contractor"). "Volunteer firefighters are considered 'employees' for purposes of R.C. 2744.03(A)(6)." *Tadijanac v. Jefferson Twp. Bellville Fire Dept.*, 2014-Ohio-4332, ¶ 55 (5th Dist.).

**{¶150}** Appellee makes reference to the firefighters authority and scope of employment, in addressing their status as employees and in asserting the applicability of the immunity exception in subdivision (a). Appellee notes these firefighters were "off the

---

[11] The statute further states, "Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term 'shall' in a provision pertaining to an employee." R.C. 2744.03(A)(6)(c).

Case No. 24 JE 0005

clock" on the day of the funeral. Appellee also emphasizes Durbin's testimony that Sebring gave him permission to take the family on the honor ride even though Sebring testified he waved Durbin toward the chief (to indicate the permission was his to give) and the testimony showed the chief was the only individual with authority to grant permission for the ride.

{¶151} Appellee provides no support for the suggestion that a firefighter providing services for a fire department event without being on the day's fire duty schedule results in non-employee status or places the cited conduct manifestly outside the scope of the firefighters' employment or official responsibilities under subdivision (a). Defendant Sebring, a volunteer firefighter with the title of safety officer, organized the funeral events for fire department's former fire chief (whose body laid in state at the fire station). At the end of the funeral for the former fire chief, Defendant Durbin, a part-time captain, drove fire engine 2218 for the funeral procession of SCJFD vehicles which followed the one containing the casket. When Durbin returned to the fire station from the funeral procession and before the funeral lunch provided by the fire department, the family boarded this fire engine. As detailed in our Statement of the Case above, family members said John Sebring spoke to them about the honor ride and about their boarding of the fire engine. Even if the chief did not personally speak to Durbin minutes before the ride (as Sebring believed), this did not create a genuine issue as to whether the loading and driving for the ride fell manifestly outside the scope of their official responsibilities. The chief testified he was the only one with the authority to make the *initial decisio*n to allow a ride and told a group of firefighters before the funeral that they could fulfill the family's request for the honor ride if they asked again.

{¶152} A plaintiff's use of the immunity exception in R.C. 2744.03(A)(6)(a) requires the act or omission to be "manifestly outside the scope" of the employee's employment or official responsibilities. The terms manifestly and scope are both important to the analysis. Manifestly is defined as "plainly and obviously." *Harris v. Hilderbrand*, 2023-Ohio-3005, ¶ 27. In viewing the scope of the employment or official responsibilities, one considers whether the actions were self-serving or with no relationship to the political subdivision's interest or business. *Id.* at ¶ 28. A reasonable person could not find from the cited evidence that Sebring or Durbin were not employees

Case No. 24 JE 0005

or that the loading or driving of the fire truck for this ride was manifestly outside the scope of these employees' employment or official responsibilities.

**{¶153}** We note Appellee also reiterates a portion of their tier one argument by stating ¶ 5 of the defense's answer created a genuine issue by generally denying the allegations in ¶ 5 of the amended complaint, which said "at all times relevant herein" the named firefighters were "agents, servants, and employees of defendant Short Creek acting within the course and scope of that agency and employment." As discussed above, the cited ¶ 5 included Trevor J. Sebring, who is John's son, rather than John Sebring who was named in caption and served with summons. Regardless, Appellee did not cite to the answer or raise this allegation of an admission in the trial court proceedings. Even more notably, Appellee's opposition to summary judgment did not even ask the trial court to apply the exception to employee immunity in subdivision (a) of R.C. 2744.03(A)(6).

**{¶154}** In addressing employee immunity, Appellee's opposition (and post-hearing brief) only raised the exception to immunity in subdivision (b). (Opp. to S.J. at 22-23); (Pl. Post-Hrg. Br. at 5). Accordingly, we proceed to address the exception to employee immunity contested by Appellee in the trial court proceedings.

**{¶155}** Appellee's opposition to summary judgment asked the trial court to apply the employee immunity exception in subdivision (b). As quoted above, this subdivision provides an exception to employee immunity where "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner . . ." R.C. 2744.03(A)(6)(b). As explained in the above section on recklessness, Appellee relied on a recklessness argument in arguing there was no immunity. However, the standard for recklessness is high. *O'Toole*, 2008-Ohio-2574, at ¶ 75 ("so summary judgment can be appropriate in those instances where the individual's conduct does not demonstrate a disposition to perversity").

**{¶156}** As previously indicated, it was not reckless to encourage boarding of a fire truck or to drive a fire truck containing people occupying positions in the back compartment that were not seats with seatbelts. There was no indication Sebring or Durbin had knowledge of a door latching issue that could cause the door to open without handle activation (let alone an actual latch issue shown to cause the door to open without activation). Ms. Appel was involved in requesting the honor ride and was very excited

Case No. 24 JE 0005

about it.  Defendant Sebring may have been the voice on video encouraging Ms. Appel to board when she expressed concern about fitting in the truck.  However, Ms. Appel voluntarily stepped into the truck, refused to take the open seat, and encouraged more people to board.  This was established in testimony and by the video of the boarding. Neither employee exhibited a "perverse disregard" of a known risk.  *See id.* at ¶ 73.

**{¶157}**  As analyzed in the recklessness section above, there was no evidence of a "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct."  *See Anderson*, 2012-Ohio-5711, at ¶ 34.  In accordance, the employees were entitled to immunity and thus to summary judgment.

**{¶158}**  For the foregoing reasons, we reverse the trial court's judgment denying the motion for summary judgment, and we hereby grant summary judgment for the political subdivision and the two employees based on immunity.

Hanni, J., dissents with dissenting opinion.

Dickey, J., concurs.

Hanni, J., dissenting.

**{¶159}** With regard and respect to my colleagues, I must dissent from the majority opinion. I would find that the trial court correctly denied SCJFD's motion for summary judgment for political subdivision immunity because genuine issues of fact exist on two issues. I would find that Appellants owed Ms. Appel a general duty of care to ensure her safety on the firetruck after John Sebring, a volunteer firefighter, encouraged her to board the firetruck after Ms. Appel expressed concern about the overcrowding on the truck.

**{¶160}** The majority holds that Appellee waived an assertion against the tier-one grant of immunity and it also finds that the "honor ride" was a proprietary function under R.C. 2744.02(A)(1). The majority concludes that under R.C. 2744.02(A)(1), Appellants are immune from damages as a political subdivision engaging in a proprietary function unless an exception under R.C. 2744.02(B) applies.

**{¶161}** R.C. 2744.02(A)(1) provides that:

Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

**{¶162}** In order to meet the definition of a "proprietary function" under R.C. 2744.01(G), the political subdivision's function must not be described as a "governmental function" and must "promote[] or preserve[] the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons." R.C. 2744.01(G)(1)(a)-(b). The statute provides examples of "proprietary functions" as including the operation of a hospital, operation of a cemetery, and the establishment, maintenance and operation of utilities, sewer systems, as well as public stadiums, buslines, railroads, or transit companies. R.C. 2744.01(G)(2)(a)-(e).

**{¶163}** The majority first holds that Appellees' counsel waived a review of this issue because he conceded at oral argument on the summary judgment motion that the "honor ride" was a proprietary function. (Opin. ¶ 62).

Case No. 24 JE 0005

**{¶164}** I agree that Appellee has waived this argument, but I do not agree that the "honor ride" was a proprietary function. While honoring a fallen firefighter is an admirable act, allowing civilians to ride on a firetruck over the firetruck's capacity after a funeral of a firefighter does not promote or preserve the health, safety, or welfare of the public. It also does not involve an activity that is customarily engaged in by nongovernmental persons.

**{¶165}** In any event, the presumptive immunity under tier I is intact. Accordingly, Appellants are immune unless one of the tier II exceptions in R.C. 2744.02(B) apply. R.C. 2744.02(B)(1) provides an exception to immunity when a political subdivision employee negligently operates a motor vehicle. R.C. 2744.022(B)(2) provides an exception to political subdivision immunity for the negligent performance of acts of its employees as to proprietary functions of the political subdivision. As set forth by the majority, both of these exceptions require the plaintiff to prove the elements of negligence: duty; breach; proximate cause, and damages.

**{¶166}** The majority correctly holds that the existence of a duty in a negligence action is a question of law and no specific formula exists for determining the existence of a duty when reviewing a negligence claim. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989). The existence of a duty is decided on a case-by-case basis. *Id.*

**{¶167}** I would find that a duty was created under the circumstances of this case after Ms. Appel hesitated to board the firetruck due to overcrowding and Mr. Sebring, a trained firefighter, encouraged her to board the truck and told her that everyone could fit on it. A firetruck is not a regular everyday common or private passenger vehicle. There are rules and requirements for driving a firetruck and carrying personnel on the truck. Unlike firefighters, the general public is not charged with knowing these rules and requirements or learning them. When Ms. Appel expressed hesitation about boarding the firetruck due to overcrowding and Mr. Sebring assured her she could fit, a duty of care was created. I would therefore find that Appellants owed a duty to Ms. Appel under these circumstances.

**{¶168}** In addition, the majority applies the primary assumption of the risk doctrine and concludes that:

Appellants had no duty to Ms. Appel to refrain from loading or moving the vehicle under the circumstances relied upon here. The cited operation of the motor vehicle and performance of the proprietary function would not constitute the breach of duty that proximately caused the injury to Ms. Appel.

*Id.* at ¶ 111. The majority further decides:

[a] person voluntarily riding in a crowded fire truck after choosing to occupy the space by the door without a seat or seat belt and then encouraging more passengers to enter instead of taking the empty seat, *primarily assumes the specific risk* of falling out if they lean on the door as the truck navigates a curve after the door handle is accidentally activated by the plaintiff (or another person).

*Id.* at ¶ 113.

**{¶169}** Ohio courts recognize three types of assumption of the risk defenses to negligence claims: express, primary, and implied. *Campagna-McGuffin v. Diva Gymnastics Academy, Inc.*, 2022-Ohio-3885 (5th Dist.). Express assumption of the risk involves an express agreement to release liability. That does not apply here.

**{¶170}** Primary assumption of the risk is the doctrine applied by the majority in this case. It applies when a defendant owes no duty to a plaintiff for negligence because the activity engaged in is inherently or obviously dangerous. The third type of assumption of the risk is implied assumption of the risk. Under this doctrine, a defendant must show that the injured party "consented to or acquiesced in an appreciated or known risk" to her safety. *Cappelli v. Youngstown Area Community Action Council,* 2006-Ohio-4952, ¶ 16 (7th Dist.).

**{¶171}** The application of the primary assumption of the risk doctrine completely bars negligence claims because it assumes that some activities contain such inherent risks that they cannot be eliminated. *Mason v. Bristol Local School Dist. Bd. Of Ed.*, 2006-Ohio-5174, ¶ 43 (11th Dist.), quoting *Brewster v. Fowler,* 2000 WL 1566528 (11th Dist. Oct. 13, 2000). It is applied as a matter of law in cases where a defendant owes a plaintiff no duty. *Id.* Courts should proceed cautiously before applying primary assumption of the

risk because it prevents a plaintiff from establishing even a prima facie case of negligence. *Wolfe v. Bison Baseball, Inc.,* 2010-Ohio-1390, ¶ 21 (10th Dist.) quoting *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 432 (1996). Further, the injured party's conduct is not examined, nor her appreciation for the inherent risks. *Id.* at ¶16. [citations omitted]. The activity itself is examined. *Id.*

**{¶172}** The majority focuses on Ms. Appel's conduct in applying the primary assumption of the risk. However, the focus for primary assumption of the risk analysis is whether the activity itself created an inherent risk of injury.

**{¶173}** I would find that riding in a firetruck does not involve such inherent obvious and unavoidable harm. Ohio courts have found that non-recreational or non-sports activities such as riding a parade float, climbing a ladder, or riding on a car's trunk lid involve primary assumption of the risk. *See Peterson v. Martyn*, 2018-Ohio-2905, ¶ 35 (10th Dist.), citing *Wagner v. Kretz*, 2017-Ohio-8517, ¶ 20 (3d Dist.)(parade float); *Foggin v. Fire Protection Specialists, Inc.*, 2013-Ohio-5541, ¶ 9 (10th Dist.)(ladder); *Cave v. Burt*, 2004-Ohio-3442, ¶ 19 (4th Dist.)(trunk lid). Riding in a firetruck is not similar to these activities.

**{¶174}** "Implied assumption of risk has been merged into Ohio's comparative negligence statute, R.C. 2315.33." *Peterson*, 2018-Ohio-2905, at ¶ 37, citing *Anderson v. Ceccardi*, 6 Ohio St.3d 110, 113 (1983). "Secondary or implied assumption of the risk exists when a plaintiff, who fully understands the risk of harm to [her]self, nevertheless voluntarily chooses to subject [her]self to it, under circumstances that manifest [her] willingness to accept the risk." *Cappelli,* 2006-Ohio-4952, ¶ 16, citing *Benjamin v. Deffet Rentals*, 66 Ohio St.2d 86, 89 (1981); Restatement of the Law (Second), Torts, Section 496C. When a case contains "'attendant circumstances that raise questions of fact whether an injured party assumed the risk in a particular situation,'" the doctrine of "implied assumption of risk, not primary assumption of risk, would be applicable." *Id.*

**{¶175}** The finder of fact usually determines implied assumption of the risk because the degrees of fault between the plaintiff and the defendant must be apportioned. *Peterson*, 2018-Ohio-2905, ¶ 37. However, a court may grant summary judgment "when no dispute exists as to any material fact and when 'the plaintiff's negligence was so extreme as a matter of law that no reasonable person could conclude that plaintiff was

entitled to recover.'" *Cappelli,* 2006-Ohio-4952*,* at ¶ 17, citing *Brady Fray v. Toledo Edison Co.*, 2003-Ohio-3422 (6th Dist.) (quoting *Collier v. Northland Swim Club,* 35 Ohio App.3d 35, 39 (10th Dist. 1987).

**{¶176}** I would apply secondary assumption of the risk and find that genuine issues of material fact exist concerning the duty and conduct of Firefighter Sebring compared to that of Ms. Appel. Ms. Appel's daughter, Kaitlyn Warren, testified at deposition that Ms. Appel was the last person to board the firetruck and she heard her mother speaking to Firefighter Sebring about taking the next ride because the firetruck was too crowded. (Warren Dep. 31). Ms. Warren testified that Firefighter Sebring encouraged Ms. Appel to board, stating that, "It's okay. You can fit," and put Ms. Appel on the firetruck. (Warren Dep. 31). Janet Hageter, Ms. Appel's sister, also testified by deposition that she overheard Ms. Appel tell Firefighter Sebring that there was not enough room on the firetruck for her and she would wait for the next truck. (J. Hageter Dep. 37-38). Ms. Hageter could not recall Firefighter Sebring's exact response to Ms. Appel's hesitation, but she thought he stated that Ms. Appel should board and they could get everyone on the firetruck. (J. Hageter Dep. 38).

**{¶177}** Accordingly, I would find that the trial court properly denied Appellants' motion for summary judgment on the basis of political subdivision immunity.

_____

For the reasons stated in the Opinion rendered herein, the final judgment and order of this Court is to reverse the judgment of the Court of Common Pleas of Jefferson County, denying the motion for summary judgment; and to hereby grant summary judgment for the political subdivision and the two employees based on immunity. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**